**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Antonio Sylvester HILL and**
**Joseph Herbert Francois,**
**Defendants–Appellees**

No. 90–5414.

United States Court of Appeals,
Eleventh Circuit.

Aug. 23, 1991.

Dexter W. Lehtinen, U.S. Atty., Robert B. Cornell, Linda Collins Hertz, Anne M. Hayes, Asst. U.S. Attys., Miami, Fla., for U.S.

John David, Fort Lauderdale, Fla., for Hill.

Theodore J. Sakowitz, Federal Public Defender, Leon Watts, Asst. Federal Public Defender, Miami, Fla., for Francois.

Before KRAVITCH and BIRCH, Circuit Judges, and DYER, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

The government appeals the district court's pre-trial order suppressing evidence in this prosecution for drug possession. Because we hold that the district court erred in finding that the search did not occur within the functional equivalent of the border, we reverse.

## I

Port Everglades, Florida, one of this country's largest cruise ship ports, receives hundreds of passengers from cruise ships every day. Although the Customs Office has posted signs around the port declaring that all persons and vehicles in the port area are subject to Customs searches, there is no continuous monitoring checkpoint to restrict land access by the public. This fact makes Port Everglades one of the few "open" ports in the country where people can freely enter the port area from the adjacent land areas within the United States. People arriving at the port by boat, however, are monitored by Customs officials as they disembark. Customs inspectors ordinarily do not maintain constant watch over the ships, but only monitor the ships as the passengers leave. The ships and crew are then free to conduct their daily business while docked. Customs officers, however, do maintain undercover surveillance positions within Port Everglades.

On January 11, 1990, the ship Mardi Gras docked, and passengers disembarked before noon. The ship was due to leave the port with a fresh load of Bahamas-bound vacationers shortly after 5:00 p.m. Having encountered past smuggling of cocaine by Mardi Gras crew members, customs officers set up undercover surveillance positions to monitor any people leaving the ship after 3:00 p.m. Shortly after 3:00, appellee Antonio Hill walked quickly down the crew gangway, draped in large, loose-fitting clothes. At that time in the afternoon there were no longer any Customs agents inspecting people leaving the ship, but only the undercover agents observing the ship from stationary positions. The agents viewing Hill's departure grew suspicious, particularly because most crew members were due back on the ship by 3:30 to prepare for departure. They observed Hill slip into the passenger side of a car waiting for him at the terminal and driven by appellee Joseph Francois. Agents monitored the

car as it drove toward an exit out of Port Everglades, and they stopped the car while it was still within the port area, about a mile and a half from the terminal. After a Customs dog alerted the agents, they searched the vehicle and discovered three packages of cocaine.

Both Hill and Francois moved to suppress the cocaine. The district court, in a pre-trial hearing, denied Hill's motion because Hill possessed no fourth amendment interest as a passenger in the car. The court granted Francois's motion, however, because 1) the agents could have conducted their search earlier, and therefore the search was improper because it was not conducted at the earliest practicable point; and 2) there was no reasonable suspicion established to otherwise permit the search.

## II

The central issue on appeal is whether this particular search at Port Everglades occurred at the functional equivalent of the border. At the functional equivalent of the border, Customs agents may conduct suspicionless searches in certain circumstances. Searches conducted at the actual border of the country are permitted without any suspicion of illegality; they are reasonable under the fourth amendment based on the single fact that the person or item entered the country from outside. *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977). For the purpose of suspicionless Customs searches, the border is elastic. Because people can enter the country at points other than along the actual border, courts look to whether the point of entry is the functional equivalent of the border. Places such as international airports within the country and ports within the country's territorial waters exemplify such functional equivalents. *See United States v. Klein*, 592 F.2d 909 (5th Cir. 1979)[1] (international aircraft); *United States v. Dobson*, 781 F.2d 1374, 1376 (9th Cir.1986) (ports and territorial waters);

---

1. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

*United States v. Prince,* 491 F.2d 655 (5th Cir.1974) (ports). *See generally United States v. Garcia,* 672 F.2d 1349 (11th Cir. 1982).

■ To determine what constitutes a functional equivalent of the border, this court has established a test which evaluates the circumstances of the search rather than merely its location. Because the crossing of the border is not as obvious at a functional equivalent of a border as it is at the actual border, this circuit requires three elements to demonstrate that a search was conducted at a functional equivalent: 1) reasonable certainty that the border was crossed; 2) no opportunity for the object of the search to have changed materially since the crossing; and 3) the search must have occurred at the earliest practicable point after the border crossing. *United States v. Santiago,* 837 F.2d 1545, 1548 (11th Cir.1988); *United States v. Garcia,* 672 F.2d at 1363–64 (11th Cir.1982). In the present case there is no dispute that the first two conditions were met. The district court found that the third element had not been met because the search could have been conducted practicably at an earlier point at Port Everglades.

The district court supported its conclusion by pointing out that the undercover agents had the opportunity to stop Hill as he exited the boat, as he entered the car, and as the car began to drive away. The government argues that these moments were not practicable points at which to stop Hill because the agents were undercover and would have disclosed their routine hiding places at the Port. The district court rejected this contention because several undercover agents later appeared at the arrest scene, indicating that they were in fact able to leave their positions.

Although the district court's reasoning contains some appeal, it does not comport with precedents applying the functional equivalent test. This circuit has upheld suspicionless searches at international airports even though the passenger had left the Customs area, *United States v. Ogueri,* 798 F.2d 452 (11th Cir.1986), had proceeded to the baggage claim area, *United States v. Santiago,* 837 F.2d 1545 (11th Cir.1988), or had been moving about the airport for thirty minutes after leaving the plane and had checked into an adjacent hotel, *United States v. Ramos,* 645 F.2d 318 (5th Cir. Unit B May 1981). In each of these cases it was possible for the Customs agents to have conducted their searches earlier, such as during the deplaning. The cases, however, held that such immediate searches were not necessary, because they found it reasonable for Customs agents to be permitted to conduct their searches when practicable in crowded or busy airports.

■ This principle of reasonableness as applied to airports is equally evident here. Although the agents could have stopped Hill at the gangplank, it would have been impracticable. In order to have searched Hill prior to when he and Francois drove away, the agents would have had to reveal their undercover positions.[2] In addition, the agents stated that generally they do not conduct individual searches on the gangplank due to the amount of public traffic in that area.[3] These concerns rendered impracticable the option of searching Hill at an earlier point. Neither the district court nor appellees present any reason why we should permit agents at airports to briefly delay their Customs searches and yet require agents at Port Everglades to reveal their undercover positions and con-

2. The district court's insistence that the agents were not in fact concerned about their positions because they later left to join the search runs counter to the agents' testimony. It also ignores the fact that the agents could, at that later point, have left their positions without detection by appellees or others, whereas had they abandoned their positions and walked up to Hill on the gangplank they would have revealed themselves not only to Hill and Francois, but also to anyone else who might have an interest in the agents' positions. To the extent that the court

found the agents' testimony on this issue incredible, the court was clearly erroneous.

3. In the related context of searches conducted near a land border at an interior checkpoint, the Supreme Court has upheld suspicionless searches based in part on the impracticability of particularized searches at the border entrance due to the high volume of traffic at the border point. *United States v. Martinez–Fuerte,* 428 U.S. 543, 557, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976).

duct immediate searches of passengers or crew members in the most crowded and public area of the Port.[4]

Appellees also contend that, even if it was not practical for the agents to have searched them prior to leaving in the car, the fact that they drove some distance from the dock indicates that they had left the area in which the functional equivalent analysis should apply. They argue that they had entered the mainstream of domestic activity and therefore left the functional equivalent of the border.

The doctrine of assimilation into the domestic mainstream has been somewhat of a Cheshire cat, appearing prominently in some opinions and completely absent from others. In *United States v. Ramos*, 645 F.2d 318 (5th Cir. Unit B May 1981), we noted that if a person entering the country at the functional equivalent of a border passed far enough into the mainstream of domestic activity, he would be "shielded" from a suspicionless search; that is, the border search rationale for a suspicionless search would have lapsed. *Id.* at 320–21. When we formulated our current test for functional equivalent cases, however, we did not include the mainstream of domestic activity as part of the test. *United States v. Garcia*, 672 F.2d at 1363–64. Instead we relied on the three factors set forth above and noted that, while the extent of domestic activity did indicate the extent of the privacy interest at stake, it served as a basis for the three-pronged test but was not part of the test itself. *Id.* at 1365. The mainstream analysis reappeared briefly in *United States v. Ogueri*, 798 F.2d 452 (11th Cir.1986), but in *United States v. Santiago*, 837 F.2d 1545 (11th Cir.1988), our most recent statement in this area, we did not address the extent of domestic activities at all; we simply applied the three *Garcia* factors.

Our understanding of our precedents is that the *Garcia* test dominates and provides the proper analysis for a functional equivalent of the border issue, and as stated above, under *Garcia* the suspicionless search of Hill and Francois was permissible. Even were we to apply the domestic activity analysis, however, there is no indication that Hill had "assimilated into the mainstream of domestic activity." Although Hill had entered a car, the car had not left the Port area. The Port area was well defined by fences and signs, the area was limited to the immediate vicinity of the Port, and visitors were well informed by signs that the area was subject to Customs laws. Hill's ride through the streets of Port Everglades was little different than an airline passenger's traversing an airport after an international flight. Hill, like the airline passenger, did not assimilate into the mainstream of domestic activities,[5] and, even under this test of questionable vitality, Hill was within the functional equivalent of the border and therefore the car he was in could be searched as part of the border search. *United States v. Lueck*, 678 F.2d 895 (11th Cir.1982) (vehicle which has not crossed border can be part of border search if agents have seen it come into contact with the object of the search).

Because we hold that the search was conducted within the functional equivalent of the border, we need not consider whether there was reasonable suspicion for an extended border search. We REVERSE the district court's grant of the motion to suppress and REMAND for proceedings consistent with this opinion.

REVERSED and REMANDED.

---

**4.** In recognizing that the Customs officers could not have searched Hill practicably at an earlier point, we note that Port Everglades is a well defined and demarcated Port area of limited size, much like an airport. This circuit has never held that the functional equivalent analysis would permit agents to follow a passenger beyond the airport area.

**5.** The airline passenger will likely have "assimilated" far more, because she can purchase beverages and commemorative trinkets, rent a car, and even check into a hotel. Because none of these activities thrust the airline passenger into the mainstream of domestic activity, *see Ramos*, 645 F.2d at 320, Hill's entering a car and driving around the Port area do not constitute assimilation into domestic activities either.