UNITED STATES of America, Plaintiff-Appellee,

v.

Shedrick McDOWELL, Bardomiano Piedra-Bustos, a.k.a. Bardomiano Bustos-Piedra, Defendants-Appellants.

No. 00-10651.

United States Court of Appeals,

Eleventh Circuit.

May 11, 2001.

Appeals from the United States District Court for the Southern District of Florida. (No. 99-06095-CR-WJZ), William J. Zloch, Chief Judge.

Before CARNES and MARCUS, Circuit Judges, and HAND[*], District Judge.

MARCUS, Circuit Judge:

Shedrick McDowell ("McDowell") and Bardomiano Piedra-Bustos ("Piedra-Bustos") appeal their convictions of conspiracy to import cocaine into the United States, and attempted possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952, and 963, and 18 U.S.C. § 2. McDowell and Piedra-Bustos argue that their convictions should be reversed because (1) the district court should have granted a motion to suppress McDowell's pre-arrest statements;  (2) the district court erroneously admitted evidence of extrinsic acts pursuant to Fed.R.Evid. 404(b);  (3) there was insufficient evidence to support the jury's verdict;  and (4) the prosecutor impermissibly commented on McDowell's post-arrest silence.  After thorough review of the record we can discern no error and affirm the convictions.

I.

The relevant facts are straightforward.  On the evening of April 23, 1999, inspectors of the United States Customs Service ("Customs") Port Everglades, Florida, anti-smuggling unit and the Florida National Guard conducted a routine search of the MV SEA RACER, a cargo ship, at the Port Everglades dock.  The SEA RACER had just arrived on a bi-monthly route originating in Barranquilla, Colombia, with intermediate stops at several other Colombian ports, Venezuela, and Jacksonville, Florida, carrying between 70 and 100 containers.  At 8:32 p.m., Customs agents inspected one of the containers, numbered CMCU 201990-5, which was manifested to contain rolls of vinyl fabric, and which had been sealed with a high security seal by

---

[*]Honorable W.B. Hand, U.S. District Judge for the Southern District of Alabama, sitting by designation.

Crowley American Marine Transport ("Crowley"), a marine transport company, prior to being offloaded from the vessel. Customs agents broke the Crowley seal in order to open the container, and observed two duffel bags sitting on top of the rolls of vinyl. They opened the duffel bags and immediately saw what appeared to be kilogram packages, retrieved the bags, and quickly resealed the container with a U.S. Customs seal. A trained narcotics dog confirmed the agent's suspicions when he alerted to the duffel bags, indicating that they contained narcotics. They took the duffel bags back to the Customs office, conducted a field test, and discovered that the 48 packages contained approximately 62 kilograms of cocaine.

After resealing the container, the Customs agents transported the container to its intended destination at the Crowley Yard, which is within Port Everglades, where the container was deposited at approximately 9 p.m. The Crowley Yard is approximately 70 acres in size and accommodates more than 2,200 containers. Crowley segregates the containers by type, such that there are separate sections of 20-foot, 40-foot, and refrigerated containers. The container in question was placed in the second row of 20-foot containers, about 5 or 10 containers from the right-hand side, and a Customs agent commenced surveillance immediately.

Appellant McDowell, a driver for Pittsville Services, Inc. ("PSI"), a trucking company that transports containers, entered the terminal at 8:36 p.m., almost immediately after the container in question had been offloaded from the MV SEA RACER. In order to enter the terminal, a driver must obtain a gate pass from the gate guard. McDowell gave the gate guard a false driver number, which was one digit off from his true number, and entered the terminal. At 9:10 p.m., just ten minutes after the container in question was deposited in a row of 20-foot containers, a Customs agent observed McDowell's truck drive up to the container. McDowell parked about 20 feet from the container, exited the truck, walked to the container, looked at it for 5 to 10 seconds, turned around, walked back to his truck, and started driving toward an exit. Customs agents stopped the truck as it attempted to leave Port Everglades.

Customs agents asked McDowell and his passenger, Charles Herbert Harper ("Harper"), to exit the truck and provide identification. McDowell asked why he was being stopped, and, in response to an agent's inquiry as to what he was doing in the Crowley Yard, McDowell said that he was working for Pittsville Services and he was sent to pick up an empty container. McDowell returned to the truck and retrieved a PSI dispatch order for a 40-foot container to be transported to a company in Tampa, Florida, called Americold. McDowell claimed that he left the Crowley Yard upon learning that the container in question was not ready.

The agent who examined the work order a few minutes later thought it was unusual because all of the information on the form was handwritten, whereas the information was usually typed on PSI dispatch

orders, and because it lacked complete addresses, booking numbers, and chassis numbers. Indeed, this information was insufficient for McDowell to locate the container he claimed to be looking for. Moreover, McDowell had approached the container in which the drugs had been found, in the section dedicated to 20-foot containers, although he later claimed to be looking for a 40-foot container.

In response to an agent's question as to the number of the container he was looking for, McDowell stated that he had not been told the container number, and that when he asked for it at the Crowley dispatch office, he was told that the container he was supposed to pick up was not ready, so he left. An agent asked McDowell for the telephone number of a dispatcher or of someone who could verify the dispatch order. McDowell said that someone named Peter had sent him, but that he could not provide a phone number.

Several minutes later, McDowell was again asked what he was doing at the seaport. This time, McDowell said that he had been dispatched by someone named Lee to pick up an empty container. An agent confronted McDowell and said, "Well, a minute ago it was Peter. Now it is Lee. Who was the dispatcher?" McDowell replied that he had never said it was Peter, that Lee was the dispatcher, and that the agent was "trying to put words in his mouth and confuse him." The agent again asked McDowell for a phone number, and this time McDowell gave him one. The agent tried the number but there was no answer and no answering machine. The agent asked McDowell if he had any other phone number, and McDowell said no.

Notably, Lee, the dispatcher for Pittsville Services, testified at trial that she had never dispatched anyone to pick up an empty container from the Crowley Yard to transport to Americold in Tampa. Moreover, Pittsville's dispatch log showed that McDowell had finished his assigned work between 4:30 and 5:00 p.m. on April 23, 1999. McDowell's gate pass was issued at 8:32 p.m. for Pittsville truck number 235 (McDowell's own truck had been assigned number 225). Nor did McDowell have his employer's permission to carry passengers in the truck on April 23, 1999, and, as a Pittsville driver, McDowell had signed an agreement not to work for any other trucking companies.

At approximately 9:45 p.m., agent Deangelus arrived. He asked McDowell to repeat what he had already told the other agents. McDowell again said that he had been dispatched by Lee, but could not provide a phone number for Lee. At approximately 10:30 p.m., Deangelus asked McDowell for consent to search the truck, and McDowell consented. When Deangelus shined his flashlight into the sleeper compartment of the truck's cab, he observed appellant Piedra-Bustos sitting "in the corner on top of the mattress," "crouched down a little." Deangelus noted that Piedra-Bustos's eyes were open. He yelled at Piedra-Bustos to put up his hands and get out of the truck.

In response to questioning as to what he was doing in the truck, Piedra-Bustos claimed to have been asleep. Deangelus removed Piedra-Bustos's wallet, looking for identification, and discovered, among other papers or documents, a business card for Caribbean Records Mfg. Corp. Underneath the printed name of the company was the handwritten telephone number, "305-245-2922," and the name Leticia. Notably, on the reverse side of the card was the handwritten number "CMCU 20257-8," which Deangelus recognized to be a Crowley container number. Indeed, on April 9, 1999, container number CMCU 202571-8 had been offloaded from the MV SEA RACER at Port Everglades. That container had been shipped by Propanol, the same company that shipped the container in which the cocaine was found on April 23. When container 202571-8 left Colombia, it bore a high security seal placed on it by the shipper, and before the container was offloaded at Port Everglades, it was affixed with a Crowley seal. However, when the container was picked up in the Crowley Yard, the trucker reported that the only thing on the container was a shipper's bolt, which is a regular bolt that can be purchased in a hardware store. The disappearance of the high security seals indicated that the container had been opened, but neither the shipper nor the consignee reported anything missing from the container. The container number on the card in Piedra-Bustos's wallet was only one digit off from the number of the opened container, and the card also contained the entire number of one of the removed high security seals.

Upon finding the business card in Piedra-Bustos's wallet, Deangelus asked Piedra-Bustos if he had any association with the Port. Piedra-Bustos said no. Deangelus asked Piedra-Bustos if he had ever worked at either Port of Miami or Port Everglades. Again, Piedra-Bustos said no, explaining that he was a carpenter and painter, and that he only worked in the construction and restaurant industries. Deangelus then asked Piedra-Bustos why he had the business card in his wallet, and Piedra-Bustos said he had never seen the card before. Piedra-Bustos also offered that perhaps agent Deangelus had placed the card in his wallet. In fact, the evidence established that Piedra-Bustos had called the telephone number handwritten on the card, which did belong to someone named Leticia, eleven times between April 1 and April 15.

Several minutes later, Deangelus again questioned Piedra-Bustos as to why he was in the truck. This time, Piedra-Bustos said that Harper, the passenger in the truck, owed him some $200, and that he had gone with Harper to retrieve the money Harper owed him. He had fallen asleep in the sleeper compartment.

While Deangelus was questioning Piedra-Bustos, other agents were searching the truck. They discovered another business card that had been torn up into five pieces. The pieces of the card were located in a garbage bag that sat between the driver's seat and the passenger's seat in the front cabin of the truck.

Deangelus was able to put the pieces of the card back together and see printed on the card the name "Admiral Insurance, Inc." On the back of the card was the handwritten number 2019905, which corresponded to the container carrying the cocaine on April 23.

About half an hour after finishing with Piedra-Bustos, Deangelus questioned McDowell again. At that time, McDowell stated that he had in fact made up a dispatch order from PSI to go to the port. He said that he had been asked earlier in the evening to go to the Crowley Yard to get something out of a container. He added that although he did not know what was in the container, he knew that it probably was illegal, but he did not know it contained cocaine, or else he would not have gone.

McDowell and Piedra-Bustos were arrested at approximately 1 a.m. on April 24, 1999. In his post-*Miranda* statement, Piedra-Bustos said that he had met up with Harper earlier that night and that Harper owed him $200 or $250, and that if Piedra-Bustos went along with him, Harper would pay him the money. Piedra-Bustos again said he got into the truck and fell asleep.

In McDowell's post-*Miranda* statement, he said that he had been out driving around in his truck and that he encountered someone who asked him to get into the Crowley yard and said that if he was able to do that, there would be "something in it for him." He said he did not know what was in the container, and again that had he known it contained cocaine, he would not have done it. McDowell also admitted going to the container and looking at the seal.

Two days after the arrests, Deangelus conducted an inventory of the impounded PSI truck. In a pile of uniforms in the sleeper compartment where Piedra-Bustos had been found, Deangelus discovered numerous torn pieces of paper. Deangelus was able to put the pieces back together and found that they comprised still another business card from Caribbean Records Mfg. Corp. There was also handwriting on the front of the card that appeared to reflect the same telephone number as on the card found in Bustos's wallet, as well as the name Leticia. On the back of the card was the number 2019905, which was the number of the container carrying the cocaine on April 23.

The parties stipulated that a total of 62.33 kilograms of cocaine with a purity of 78 percent was seized. Trial testimony further established that the cocaine had a wholesale value of $848,000 and a street value of $7,479,600.

II.

The applicable standards of review are not in dispute. Whether a person was in custody and entitled

to *Miranda* warnings is a mixed question of law and fact; we review the district court's factual findings on the matter for clear error and its legal conclusions *de novo. United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir.1996). Whether there is sufficient evidence to support a conviction is a question of law which this Court reviews *de novo. United States v. Tarkoff,* 242 F.3d 991, 993 (11th Cir.2001). The relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Cunningham,* 194 F.3d 1186, 1193 (11th Cir.1999). Finally, where the defendant does *not* object to comments made by the prosecution at trial, the standard of review is plain error. *United States v. Hernandez,* 921 F.2d 1569, 1573 (11th Cir.1991).

III.

First, McDowell challenges the district court's denial of his motion to suppress the statements he made to investigating agents during their roadside inquiry *before* he was formally placed under arrest and informed of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court held a hearing on McDowell's motion to suppress, concluded that he was not "in custody" during the roadside stop, and denied the motion.

Whether McDowell was "in custody" prior to his formal arrest depends on whether "under the totality of the circumstances, a reasonable man in [his] position would feel a restraint on his freedom of movement ... to such extent that he would not feel free to leave." *Moya,* 74 F.3d at 1119. The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. *Id.* More specifically, the Supreme Court had stated that whether a suspect is "in custody" turns on whether restrictions on the suspect's freedom of movement are "of the degree associated with formal arrest." *Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984).

We add that when a suspect is detained in a border zone, whether interrogation is "custodial" should be interpreted in light of the strong governmental interest in controlling the borders. *Moya,* 74 F.3d at 1119. "Interrogation at the border constitutes one notable exception to the constitutional protection of *Miranda.* Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry

to the United States." *United States v. Lueck,* 678 F.2d 895, 899 (11th Cir.1982); *cf. United States v. Vigil-Montanel,* 753 F.2d 996, 998 (11th Cir.1985) (discussing *Lueck* in airport-security context). Due to the sovereign's responsibility, "some degree of questioning and of delay is necessary and to be expected at entry points into the United States. Because of this expectation, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." *Moya,* 74 F.3d at 1120 (quotation marks omitted).

In *Moya,* we held that a suspect detained in a border zone was not "in custody" during a pre-arrest interview where he was not physically moved or restrained by officers during the interview, no handcuffs were employed and no guns were drawn, he was not booked or told of formal accusations, nor told that he was under arrest, he did not ask to leave and was not told that he was not free to do so, and he made no admissions during the interview that would have led a reasonable person in his place to conclude that he would be arrested immediately. 74 F.3d at 1119.

Port Everglades is the functional equivalent of a border, *see United States v. Hill,* 939 F.2d 934, 938 (11th Cir.1991), and accordingly, the reasoning of *Moya* applies with full force here. As in *Moya,* McDowell was not physically restrained during the roadside stop. He was not handcuffed and no guns were drawn. The substance of the questioning was not accusatory; Customs agents simply inquired as to why McDowell was in the seaport, but did not ask him about the cocaine found in the container. McDowell did not ask to leave, and he was not told that he was not free to do so. The Customs agents on the scene did not take McDowell's keys, and he was permitted to return to the truck unaccompanied in order to retrieve documents. Under these circumstances, the teachings of *Moya* suggest that McDowell was not "in custody" prior to his arrest.

To the extent McDowell argues that the duration (approximately four hours) converted this inquiry into a custodial interrogation, we are unpersuaded. As McDowell concedes, there is no fixed limit to the length of questioning. Here, the investigation was delayed initially by 45 minutes in order for Customs agents with authority to conduct the investigation to arrive. Once the investigation was underway, McDowell repeatedly confounded the agents' efforts to verify his purpose in the seaport by giving them fictitious and plainly conflicting accounts for his presence, and he further drew out the stop by refusing to provide a working contact phone number for Pittsville Services. Notably, he did not inform the agents of Piedra-Bustos's presence in the sleeper compartment of the PSI truck. Following the discovery of Piedra-Bustos, it was necessary for agents to question Piedra-Bustos, and McDowell then provided yet another account for

his activities. We do not see that the length of this stop, which was drawn out considerably by McDowell's own actions, and the circumstances surrounding this nighttime stop at Port Everglades, transformed it into a custodial interrogation.

IV.

Next, both McDowell and Piedra-Bustos argue that the district court erred in admitting evidence, pursuant to Fed.R.Evid. 404(b), concerning events relating to the Sea Racer's stop at Port Everglades on April 9, 1999. As noted, the agents found in Piedra-Bustos's wallet a business card with handwritten numbers corresponding to the container number (less one digit) and the seal number of another container from the same shipper in Colombia to the same consignee in the United States, from which the high security seals had been removed on April 9, 1999, and from which nothing was reported missing. On the evening of April 9, 1999, a Pittsville Services truck drove into the Crowley Yard and obtained entrance by giving as his driver number the number 725, which was false since PSI's highest number was 259. Surprisingly, the security tapes from April 9 had been deleted (as they were on April 23), making it impossible to determine who drove the PSI truck, but notably, the number 725 was one digit off from McDowell's real driver number (225).

Initially, McDowell and Piedra-Bustos were charged in Count III of the indictment with conspiracy to smuggle goods into the United States and facilitate the transportation of those goods, knowing they were imported in violation of the law. At the close of the evidence, the government moved to dismiss Count III, and defense counsel moved to strike all evidence concerning the events of April 9. The government argued that the evidence had properly been admitted because the events of April 9 were inextricably intertwined with those of April 23, and alternatively, that the evidence also was admissible pursuant to Fed.R.Evid. 404(b).[1] After hearing extensive argument on the subject, the district court ruled that the evidence was admissible pursuant to Fed.R.Evid. 404(b).

We discern no abuse of discretion in the district court's decision to admit the evidence relating to April 9. The evidence relating to McDowell and Piedra-Bustos's prior acts was properly admitted to show

---

[1]Fed.R.Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused the prosecution in a criminal case shall provide reasonable notice in advance of trial, ... of the general nature of any such evidence it intends to introduce at trial.

motive, intent, and *modus operandi.* *See United States v. Elliott,* 849 F.2d 554, 558 (11th Cir.1988) (holding that evidence was properly admitted where it was "probative of motive and intent, as well as identity."); *United States v. Alston,* 460 F.2d 48, 55 (5th Cir.1972) ("it is also settled law that prior or subsequent incidents may be introduced to establish that the defendant possessed the requisite knowledge or intent."). *See also United States v. McLean,* 138 F.3d 1398, 1403 (11th Cir.1998) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.").

The evidence relating to April 9 is probative of the *modus operandi* or plan of the conspiracy. The government's theory of the conspiracy was that the defendants smuggled cocaine using the "rip method," in which duffel bags of cocaine are placed inside a container with an otherwise legitimate shipment, and are removed by breaking the Crowley seal, retrieving the bags, and resealing the container before the container is picked up and delivered to the consignee. On April 9, as on April 23, a Pittsville Services truck entered the Crowley Yard under a false driver number, and the seal was broken on a container shipped on the same ship by the same shipper to the same consignee carrying the same merchandise. On April 9, the seal on the container was broken, nothing was reported missing, and the driver who had entered without a container left without a container. On April 23, McDowell entered the Crowley Yard with a false driver number, and a jury was entitled to infer that but for the U.S. Customs seal, he would have broken the seal and removed the cocaine. We believe that a jury could find, based on a preponderance of the evidence, that McDowell and Piedra-Bustos entered the Crowley Yard in a Pittsville Services truck on the evening of April 9, it was McDowell who gave the false driver number to the gate guard, and that McDowell broke the seal on the container in question. We are thus satisfied that the evidence relating to April 9 was admissible to show *modus operandi* or plan, and that it was probative of the Appellants' knowledge and intent.

V.

McDowell and Piedra-Bustos also challenge the sufficiency of the evidence to sustain their convictions of conspiracy to import cocaine and attempted possession with intent to distribute cocaine. McDowell argues that the evidence shows no more than his "mere presence" in the Crowley yard on April 23. Piedra-Bustos claims that the evidence only establishes his presence in McDowell's truck. We are not persuaded. "Accepting all reasonable inferences which support the verdict, we will affirm the conviction if

a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt." *United States v. Mieres-Borges,* 919 F.2d 652, 656 (11th Cir.1990) (quotation marks omitted). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among the constructions of the evidence." *United States v. Calderon,* 127 F.3d 1314, 1324 (11th Cir.1997). Where, as here, the Government's case is based on circumstantial evidence, "reasonable inferences, not mere speculation, must support the jury's verdict." *United States v. Perez-Tosta,* 36 F.3d 1552, 1557 (11th Cir.1994).

To sustain a conviction for conspiracy to possess cocaine with intent to distribute, the government must prove beyond a reasonable doubt that (1) an illegal agreement existed; (2) the defendant knew of it; and (3) the defendant, with knowledge, voluntarily joined it. *See United States v. Lopez-Ramirez,* 68 F.3d 438, 440 (11th Cir.1995). It is not necessary to prove a defendant's participation in a criminal conspiracy by direct evidence. *See United States v. Quilca-Carpio,* 118 F.3d 719, 721 (11th Cir.1997). Instead, "a common purpose and plan may be inferred from 'a development and collocation of circumstances.' " *United States v. Khoury,* 901 F.2d 948, 962 (11th Cir.1990) (quoting *United States v. Malatesta,* 590 F.2d 1379, 1381 (5th Cir.1979)). Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme. *Khoury,* 901 F.2d at 962-63.

To sustain a conviction for attempted possession with intent to distribute cocaine, the government must prove beyond a reasonable doubt that the defendants (1) acted with the kind of culpability required to possess cocaine knowingly and wilfully and with the intent to distribute it; and (2) engaged in conduct which constitutes a substantial step toward the commission of the crime under circumstances strongly corroborative of their criminal intent. *See United States v. Collins,* 779 F.2d 1520, 1530 (11th Cir.1986); *United States v. Forbrich,* 758 F.2d 555, 557 (11th Cir.1985). We measure the evidence presented against McDowell and Piedra-Bustos against these familiar standards.

First, the evidence established that two duffel bags containing some 62 kilograms of cocaine worth more than 7 million dollars in street value were found in a 20-foot shipping container (bearing number CMCU 201990-5) at Port Everglades on April 23, 1999. The kilogram-sized packages were wrapped in various colors, but were not otherwise concealed inside the duffel bag. Indeed, it was readily apparent to the Customs

agents that the duffel bags contained illegal drugs.

Within only minutes of the container's arrival at the Crowley Yard, McDowell and Piedra-Bustos drove straight to the container in question, even though the Yard covered some 70 acres and had the capacity to store more than 2200 shipping containers, grouped in 20-foot, 40-foot, and refrigerated container rows. Moreover, the written work order which McDowell produced did not have a container number or "booking number" that would have enabled him to follow the normal procedure and obtain from the Crowley Yard dispatch office the row number and position of the container. Under these circumstances, a jury could reasonably have inferred that Appellants were notified by someone inside the Port that the dope had arrived, as well as its precise location. Notably, McDowell walked up to the container, abandoned it only after he saw the U.S. Customs seal, and immediately attempted to leave the Yard.

Viewed in the light most favorable to the government, the evidence shows that McDowell and Piedra-Bustos went together to Port Everglades on the night of April 23 to secure the cocaine. Indeed, they were not just casually present in the Port that evening. To the contrary, McDowell intentionally used a false driver number to obtain entry into Crowley Yard, and he admittedly falsified a written work order to facilitate their entry. Moreover, they are both directly tied to the cocaine-laden container in other ways. McDowell, for his part, not only had a business card with the number of the container written on it in a trash bag near the front seat of the cab, but he walked right up to the container containing the cocaine, and upon seeing the Customs seal, left immediately. Piedra-Bustos was directly linked to the container by a business card which agents found torn into pieces in the sleeper compartment where Piedra-Bustos was hiding, on the back of which was written the container number housing the cocaine. If there was any doubt that the card belonged to Piedra-Bustos, he had an identical card in his wallet, and he had called the telephone number handwritten on both cards numerous times.

The very fact that the cocaine was not concealed in any way also supports the conclusion that McDowell and Piedra-Bustos knew the container contained cocaine. The duffel bags were readily visible, and would have been discovered by the first person to open the container. A reasonable jury could infer that the shippers intended the cocaine to be removed using the "rip method," and given that the agent watching the container observed no other activity near the container, that McDowell and Piedra-Bustos were indeed the intended recipients of the duffel bags. Likewise, a reasonable jury could infer that McDowell and Piedra-Bustos would not have been entrusted with bags containing seven million dollars worth of cocaine without knowing what the bags contained. *See Quilca-Carpio,* 118 F.3d at 722 ("A reasonable jury could infer from

the quantity of drugs seized that a 'prudent smuggler' is not likely to entrust such valuable cargo to an innocent person without that person's knowledge.").

Significantly, McDowell and Piedra-Bustos both also engaged in acts and statements of falsity and concealment which strongly suggest their knowledge and that they acted with the kind of culpability required to possess cocaine knowingly and wilfully and with the intent to distribute it. McDowell first obtained access to the Crowley Yard on April 23, 1999 by giving a false driver number at the gate. Second, he admittedly falsified the written work order he produced to Customs agents. Third, he offered Customs agents three false and internally conflicting exculpatory statements. He claimed first to have been dispatched by Peter to pick up a 40-foot container (although he drove up to a row containing only 20-foot containers), and then claimed to have been sent there by Lee. Both Peter and Lee, president and dispatcher of PSI, denied sending McDowell to pick up any container that evening, and McDowell himself then admitted that he had not been sent by PSI, and that he had falsified the dispatch order to gain entry into the Port. McDowell then admitted knowing that there was probably something illegal in the container, but claimed not to have known it was cocaine. Finally, McDowell claimed in a post-arrest statement that he was out driving around in his truck when he enountered someone who asked him to get into the Crowley Yard, and that if he was able to do so, there would be something in it for him. These accounts were false and internally conflicting, and a jury was free to find his explanation completely implausible.

Piedra-Bustos similarly committed acts of concealment and gave false exculpatory statements. First, a jury was entitled to conclude that Piedra-Bustos purposefully concealed himself in the sleeper compartment of the truck's cab for some ninety minutes while agents questioned McDowell and passenger Harper. Second, a jury could have inferred that Piedra-Bustos tore the business card containing the number of the cocaine-laden container into tiny pieces and concealed them in a pile of dirty uniforms while he was hidden in the truck. Third, when the Customs agent found in Piedra-Bustos's wallet the business card with the April 9 container number and asked Piedra-Bustos whether he had any association with the Port, Piedra-Bustos unambiguously said that he did not, although this claim was flatly contradicted by his possession of two business cards directly linking him to the two containers. Fourth, Piedra-Bustos went on to say that he had never seen the business card before, and suggested that the Customs agent had wrongly placed the card in his wallet. Not only was his assertion that he had never before seen the business card taken from his wallet contradicted by his telephone records, which confirmed that he had called the handwritten telephone number on the card repeatedly over the prior weeks, but the fact that the business card clearly belonged to Piedra-

Bustos makes his suggestion that the Customs agent had framed him that much more incredible. Finally, a reasonable jury could have found Piedra-Bustos's account for his presence while hiding for an hour and a half in the sleeper compartment of the truck's cab—that McDowell's passenger Harper owed him $200 for painting work and told him to come for a ride to the Port so that he would get his money—to be wholly implausible.

We have recognized that "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. Alejandro,* 118 F.3d 1518, 1521 (11th Cir.1997); *see also United States v. Eley,* 723 F.2d 1522, 1525 (11th Cir.1984) (" 'When a defendant voluntarily and intentionally offers an explanation and this explanation is later shown to be false, the jury may consider whether the circumstantial evidence points to a consciousness of guilt, and the significance to be attached to any such evidence is exclusively within the province of the jury.' Moreover, wholly incredible explanations may also form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge.") (citation omitted). A jury was free to conclude that McDowell was not only lying in his first two statements, but that he was also lying when he said he did not know there was cocaine in the container. Likewise, a reasonable jury could have concluded that Piedra-Bustos lied when he said he had been asleep in the truck, when he claimed to have no connection to the Port, when he said he had never seen the business card before, when he suggested that the agent had framed him by putting the card in his wallet, and when he gave an implausible account for his presence in the Port. Quite simply, a jury was free to infer from appellants' false statements and acts of concealment, evidence of their guilty knowledge, culpability, and intent to import cocaine and attempt to possess with intent to distribute cocaine.

Finally, the Rule 404(b) evidence relating to the events of April 9, 1999 also supports an inference that McDowell and Piedra-Bustos willfully and voluntarily joined a conspiracy to import cocaine using the "rip method." On April 9, 1999, as on April 23, 1999, a driver entered the Crowley Yard in a Pittsville Services truck, using a false driver number. The seal was broken on a container, indicating that it had been opened, which was sent by the same consignor to the same consignee on the same vessel as the cocaine-laden container on April 23, 1999. Piedra-Bustos had, in his wallet, a business card with the entire seal number and the container number, missing only one digit, of that container, linking him directly to the April 9th container. Although there was no eyewitness who could place McDowell at the Crowley Yard on April 9, 1999, it was a PSI truck that entered the Yard that evening, and the driver gave the number 725, only, one digit off from McDowell's assigned number of 225. Moreover, the video surveillance tape was mysteriously erased on April

9, as it was also on April 23, suggesting that someone inside the Crowley Yard was involved in the illegal enterprise. Neither the shipper nor the consignee reported anything missing. The evidence relating to April 9 further bolsters an inference that the modus operandi of the conspiracy was the "rip method," that McDowell and Piedra-Bustos were voluntary and wilful participants in the illegal enterprise, and that they knew the container they were looking for on April 23, 1999 was laden with cocaine.

Accordingly, we are satisfied that there was sufficient evidence to support the jury's verdicts.

VI.

Finally, McDowell argues, for the first time on appeal, that an impermissible comment by the prosecutor as to McDowell's post-arrest silence warrants reversal of his conviction. Where, as here, an argument is raised for the first time on appeal, our review is for plain error, and we will find plain error only where (1) there is an error, (2) the error is plain or obvious, (3) the error affects the defendant's substantive rights in that it was prejudicial and not harmless, and (4) the error seriously affects the fairness, integrity, or public reputation of a judicial proceeding. *See United States v. Chisholm,* 73 F.3d 304, 307 (11th Cir.1996). Where there are allegations that a prosecutor has commented indirectly on a defendant's post-arrest silence, the prosecutor's comment will not be considered an impermissible reference to a defendant's silence unless (1) it was the government's manifest intention to do so, or (2) it was of such a character that the jury would naturally and necessarily take it as a comment on the defendant's silence. *See United States v. Exarhos,* 135 F.3d 723, 728 (11th Cir.1998), *cert. denied,* 526 U.S. 1029, 119 S.Ct. 1275, 143 L.Ed.2d 369 (1999).

The comment to which McDowell objects related to the forfeiture of his truck. During cross-examination of a Customs agent, McDowell's counsel asked the agent the following:

Q       [Defense Counsel]:  Regarding the Peterbilt, the Peterbilt has been seized.

A       [Customs agent]:  Yes, Sir.

Q:      The Peterbilt is going to be—you are going to try to forfeit it and take it away from Mr. McDowell. Regardless of what happens here today the truck is going to be gone.

Q:      The truck is gone, correct?

A:      The truck is still within Customs' custody, Sir.

Q:      And proceedings have been initiated to forfeit the truck to the U.S. government for sale later on.

A:      Those are not proceedings in which I file paperwork, but I have that understanding, yes, sir.

On redirect examination, the prosecutor inquired of the Customs agent as follows:

Q       [Prosecutor]:  On cross-examination [defense counsel] asked you about the forfeiture of Mr.

McDowell's truck.  Do you recall those questions?

A:    Yes, sir, I do.

Q:    Do you know if Mr. McDowell has the legal right to fight the forfeiture of his truck?

A:    Yes, sir.  It is called a petition.

Q:    So he doesn't just get it taken away from him.  There is some kind of legal process much like his trial is a legal process, right?

A:    Yes sir, that's correct.

We see no error, plain or otherwise, in the prosecutor's questions.  They do not suggest that McDowell failed to make a claim for his truck, and it is clear from the context that the prosecutor sought only to establish that the government would not unilaterally forfeit McDowell's truck without an opportunity for him to respond.  At most, the questions and responses suggest only that the forfeiture proceedings had not yet concluded.

For these reasons we affirm appellants' convictions.

AFFIRMED.