**UNITED STATES of America,**
**Appellant,**

v.

**Raymond Wayne RAMOS, Appellee.**

**No. 79–2647.**

United States Court of Appeals,
Fifth Circuit.
Unit B

May 18, 1981.

---

319

Linda L. Carroll, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellant.

Neal Sonnett, Benedict Paul Kuehne, Miami, Fla., for defendant-appellee.

Before TUTTLE, VANCE and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Raymond Wayne Ramos, indicted for importing 312.3 grams of cocaine into the United States in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), and for possession of same with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), moved to suppress the cocaine seized at the time of his arrest. The motion was granted and the government appeals pursuant to 18 U.S.C. § 3731, 473 F.Supp. 1109. Concluding that the government could not prove the offenses charged without the suppressed evidence, the district judge dismissed the indictment without prejudice to the government to reindict upon reversal of the suppression order. Finding this case controlled by our recent *en banc* decision in *United States v. Sandler,* 644 F.2d 1163 (5th Cir. 1981), we reverse the order granting the motion to suppress, and vacate the order of dismissal.

*Operative Facts*

Ramos arrived at Miami International Airport shortly before midnight on November 18, 1978, on a flight originating in Bogota, Colombia. Ramos was the first passenger to present himself to Customs Inspector Elizabeth Cocchini. He explained that he had only a briefcase because his luggage had been misdirected to Mexico, declared a ring and was passed through customs. Almost immediately Inspector Cocchini was requested to do a secondary inspection of a female passenger, Sheri Dean Anderson, who had arrived on the same flight. This secondary inspection was occasioned by Miss Anderson's demeanor, responses to certain questions and her bulky appearance. Inspector Cocchini and another female inspector took Miss Anderson to the secondary inspection area and in the ensuing check found several plastic bags taped to her body. The white powdery content of the bags field tested positive for cocaine.

Following discovery of the cocaine on Miss Anderson, Supervisory Inspector Vic Basile was notified; immediately he gathered the Customs Declaration cards from all passengers and examined them. He found that Miss Anderson listed Tampa, Florida as her home city, as did another passenger, one R. Ramos. Inspector Basile examined the contents of Miss Anderson's handbag and found a large sheet of paper listing three names, E. Harwell, S. Anderson and W. Ramos, together with an apparent travel itinerary to New York, Burlington, Vermont with a return to Bogota. Inspector Basile was alerted by the confluence of factors: Ramos and Anderson listed the same home city, both were on the flight, Anderson had drugs secreted on her person and she had a ь eet listing the name of Ramos and another and a travel itinerary to New York, Burlington, Vermont and return to Bogota. Basile, aware that drug "mules" frequently are accompanied for security purposes, asked Inspector Cocchini what she recalled about Ramos who only minutes before had passed through the custom's line. Cocchini related that Ramos was the first passenger, that he had no

luggage and she was certain she would recognize him.

Inspectors Basile and Cocchini left the customs enclosure and located Ramos, who was wearing the same clothes and carrying the same briefcase, in the airport lobby near the airport hotel. Ramos had registered in the hotel but there is no indication that he had gone into his room. Approximately thirty minutes had elapsed since his passage through customs. The inspectors approached Ramos and asked him to return to the customs enclosure. Ramos consented and was escorted to the secondary inspection room then occupied by Inspector Sigmund Korzenowski. Inspector Korzenowski conducted what he considered to be a routine pat-down and discovered a large bulge on Ramos' left lower leg. A closer examination disclosed that the bulge was caused by a package of cocaine taped to Ramos' leg and covered by an ace bandage. The government suggests that Inspector Korzenowski would testify that a further search revealed another package of cocaine taped to Ramos' abdomen. We do not consider this suggested evidence.

### District Court Analysis

The district court referred the motion to suppress to a magistrate who recommended that the motion be denied; Ramos objected to the recommendation. The district court, in reviewing the matter, concluded that three issues were presented: (1) did the search of Ramos occur at the border or its functional equivalent, (2) was it reasonably certain that the contraband found had actually crossed the border, and (3) was the pat-down by the customs inspector justified by a reasonable suspicion that Ramos was carrying either contraband or a weapon. The district judge's analysis resulted in affirmative answers to numbers (1) and (2), however, answering number (3) in the negative the court granted the motion to suppress.

### 1. The Border, or Beyond?

We repeat the district judge's subtitle for the first inquiry and we find no error in his factual findings or legal conclusions thereunder. In the resolution of this issue the trial judge found controlling our decision in *United States v. Walters*, 591 F.2d 1195 (5th Cir. 1979), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 317 (1979). In *Walters* we declined to draw formalistic rules based on time and distance of penetration into the country, but rather we held that we would "continue to determine whether a search is at the border based on whether the rationale for border searches is vindicated without impinging the rights of persons" lawfully within the country. *Id.* at 1198. Two essential criteria were noted: (1) the degree to which the traveler has been assimilated into the mainstream of domestic activity, and (2) whether the evidence preponderates that the contraband seized has actually crossed the border.

We began our analysis in *Walters* by noting several previous holdings that the customs enclosure at Miami International Airport is the functional equivalent of the border. *United States v. Martinez*, 577 F.2d 960 (5th Cir.), *cert. denied*, 439 U.S. 914, 99 S.Ct. 288, 58 L.Ed.2d 262 (1978); *United States v. Barger*, 574 F.2d 1283 (5th Cir. 1978); *United States v. Olcott*, 568 F.2d 1173 (5th Cir. 1978). We then examined the activity of Walters and found that she initially had passed through the customs enclosure into the main lobby of the Miami airport. Walters testified that during the ensuing fifty-five minutes she went upstairs to the end of the terminal building, entered a drugstore, purchased a soda, looked at magazines and then returned to the airport lobby. Upon her return she was approached by a customs agent who asked her to return to the customs area where she was required to submit to a strip search. We held that Walters "was not significantly removed physically or temporally from the border. Moreover, to the extent [Walters] was removed from the border, the *nature* of her activities was not such that would require an intrusion into domestic activities in order to search her." 591 F.2d at 1198.

█ In the case at bar Ramos was approached by customs officials within thirty minutes after leaving the customs enclo-

sure. Ramos, unlike Walters, had checked into the airport hotel which is a part of the terminal complex; however, there is no indication that he had gone to his room. This fact does not sufficiently distinguish the instant case from *Walters*. Ramos had not changed clothes since his departure from the customs enclosure, and he was carrying the same briefcase. The district court concluded that Ramos remained at the functional equivalent of the border and that the customs inspectors had the right to detain him for further questioning. We agree. Ramos had not been assimilated into the mainstream of domestic activities so as to shield him from appropriate border examinations and searches.

### 2. Did the Contraband Cross?

■ The second issue addressed in *Walters* is whether the preponderance of the evidence establishes that the contraband actually crossed the border. We adopt as our own the findings and reasonings of the district judge on this issue:

"The question of whether it is reasonably certain that any contraband found by customs inspectors actually crossed the border has usually arisen in connection with the determination of whether the search occurred at the border. In most cases it makes sense to combine these determinations, because if it is not reasonably certain that contraband, if found, crossed the border, then a true border search cannot be made, despite the other factors which point to the existence of a border search.

"In other cases, such as this one, it makes more sense to consider the issue of 'reasonable certainty' separately. This separate consideration is necessary because here, where there is a break in the surveillance, it may be reasonably certain from the pre-search perspective that any contraband found will be determined to have crossed the border, but after the particular contraband is discovered there is still some question as to whether it is reasonably certain that the particular contraband crossed the border. Thus, a second-prong determination of reasonable certainty must be made based upon the post-search facts.

"In this case, the defendant contends that the cocaine found taped to his leg and secured by an ace bandage easily could have been obtained and secured in this fashion during the break in surveillance. Thus, the defendant concludes that the government has not established to a reasonable certainty that *this* cocaine crossed the border.

"The government, in opposition, asserts that reasonable certainty has been established by the evidence that there was only a thirty minute lapse in the surveillance of Ramos, that Ramos had not changed clothes, that Ramos still carried his briefcase, and that Ramos had just arrived at 11:30 at night on a flight from Colombia and checked into a hotel.

"After carefully reviewing these circumstances, the court agrees with the government that it is reasonably certain that the contraband found on Ramos crossed the border. The government is not required to negate every hypothetical possibility as to how the contraband may have been obtained subsequent to the border crossing. In this case, the mere assertion by the defendant that there was the opportunity to obtain the contraband after the border crossing is insufficient to controvert the facts established by the government. Although opportunity is, of course, one factor, and might be the controlling factor if the contraband were found loose in a pocket or purse, the court finds that it is highly unlikely that cocaine obtained after a long international flight, late at night almost contemporaneously with registration in a hotel, would be carried in the manner of the cocaine found in this case."

### 3. Was the Pat-Down Proper?

It is the district court's response to the third inquiry with which we differ, *i. e.*, that the circumstances were such that Inspector Korzenowski did not have reasonable suspicion Ramos was carrying contraband or a weapon and therefore he could not conduct the pat-down search. In reaching this conclusion the district judge followed the course directed by existing precedent. Whether Inspector Korzenowski had

reasonable suspicion sufficient to justify the pat-down is not a relevant inquiry and we need not examine the record to resolve that question. The issue of pat-down searches at the border, and its functional equivalent, has been definitively resolved by this court in our *en banc* decision in *Sandler, supra.*

In *Sandler* the defendant was returning to the United States after a trip to South America. A customs inspector observing Sandler in the baggage enclosure area noticed that he had on full-cut trousers, new boots and walked in a stiff manner. After Sandler's baggage was examined, the customs inspector checked his passport, found that he had been traveling in Bolivia and Peru and decided to conduct a secondary examination. A routine pat-down search revealed packages of cocaine taped to Sandler's legs.

Sandler moved to suppress the evidence on the ground that the customs inspector did not have a reasonable suspicion of possible illegal activity. The motion was denied and Sandler was convicted of importing cocaine. A divided panel of this court concluded that the standard for determining the validity of a body search conducted at the border is reasonable suspicion and reversed the conviction. We vacated the panel opinion and sitting *en banc* affirmed the conviction, holding:

> We conclude that examination of a person by ordinary pat-down or frisk, the requirement that outer garments, such as coat or jacket, hat or shoes, be removed, that pockets, wallet or purse be emptied, are part of the routine examination of a person's effects which require no justification other than the persons' decision to cross our national boundary. The single fact that such a search occurs at a border makes it reasonable within the meaning of the fourth amendment. We do not read 19 U.S.C. § 482 as requiring any suspicion other than the subjective response of a customs official who considers that the circumstances make such a search appropriate.

644 F.2d at 1169.

Under the holding in *Sandler* a routine, non-offensive pat-down or frisk made at the border is justified by a traveler's request to cross our national border. Accordingly, customs officials are entitled to view the totality of the circumstances and determine whether a non-intrusive pat-down is indicated.

The pat-down search of Ramos clearly was the result of a subjective response of a customs inspector who concluded in good faith, and absent a whisper of improper motive, that a secondary examination was in order. The pat-down of Ramos was appropriate under the circumstances. The evidence seized as a result of the search should not have been suppressed.

The judgment of the district court granting the motion to suppress is REVERSED and the judgment dismissing the indictment is VACATED.