In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2422

United States of America,

Plaintiff-Appellee,

v.

Teng Yang,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 677--Harry D. Leinenweber, Judge.

Argued January 7, 2002--Decided April 4, 2002


   Before Manion, Rovner, and Evans, Circuit
Judges.

   Manion, Circuit Judge.  Defendant Teng
Yang appeals his conviction under 21
U.S.C. sec. 952(a) for importation of
opium into the United States. Mr. Yang
pleaded guilty to the charge after the
district court conducted an evidentiary
hearing and denied his motion to suppress
evidence of drugs seized at the airport
after he had passed through customs. Mr.
Yang expressly reserved the right to
appeal the district court's denial of his
motion to suppress and now appeals that
order. We affirm.

I.  Background

   Teng Yang ("Teng") and his cousin Lee
Pao Yang ("Lee Pao") flew into Chicago's
O'Hare International Airport on September
7, 1999, from Laos connecting through
Tokyo, Japan. Both men were booked on an
American Airlines flight from O'Hare to
St. Paul, Minnesota. Teng and Lee Pao are
both American citizens who had traveled
to Laos to attend Teng's father's
funeral. But when they returned to the
United States from Laos, their suitcases
had been packed with clothes which had
been soaked in an opium solution and then
dried. Teng passed through customs at
O'Hare without incident. His suitcase was
x-rayed at the agricultural inspection

area, but his luggage was not searched by hand. After leaving the customs area, Teng took his luggage and proceeded to the American Airlines terminal, less than a mile away, via the O'Hare airport tram.

His cousin was less fortunate. Lee Pao was detained randomly for an enforcement exam and the inspectors discovered some unusually stiff clothing made of sweat-pant material in his suitcase. The clothing, which had a very strong odor, chemically tested positive for opiates. Lee Pao was arrested on the scene and, following questioning by the customs officials, he admitted that he was traveling with another person. American Airlines officials confirmed that Teng was booked on the same itinerary as his cousin. The customs agents then decided to intercept Teng based on Lee Pao's admission that they were traveling together, the fact that drugs were found in Lee Pao's bag, and the fact that both men were traveling on the same itinerary from Laos, a drug source country, to St. Paul, a drug destination city. They did not obtain a search or arrest warrant. The customs agents requested that the baggage crew separate Teng's baggage from the other luggage on the flight to St. Paul. The agents then proceeded to the American Airlines terminal and announced Teng's name over the loudspeaker. When no one responded, agents proceeded to search the terminal. One of the agents, Inspector Joseph Marcocig, recognized Teng, as he had seen him in line at customs with Lee Pao. Teng was taken down to the tarmac where he identified his luggage. He then agreed to return to the international terminal for questioning. The agents handcuffed him pursuant to customs policy for transportation of individuals in a vehicle ("for [their] protection and his") and returned to the international terminal. A search of his bags revealed more opium-soaked clothes.

Teng and Lee Pao were charged in an indictment with conspiracy to import opium and importing large quantities of opium. Teng and Lee Pao filed a motion to suppress the evidence seized at the airport, which the court denied after an evidentiary hearing. In February 2001, Teng pleaded guilty to count three of the indictment which charged him with the importation of 2,737 grams of opium. In doing so, he reserved the right to appeal the trial court's denial ruling on his

motion to suppress. The district court then sentenced him to 24 months in prison followed by three years of supervised release. He now appeals the district court's denial of his motion to suppress the evidence found in his suitcase.

## II. Analysis

In reviewing a district's court's ruling on a motion to suppress, this court reviews questions of law de novo andfindings of fact and reasonable inferences drawn from those findings for clear error. United States v. Peters, 153 F.3d 445, 451 (7th Cir. 1998). Teng argues that the district court erred in denying his motion to suppress, claiming that the customs agents searched his suitcase in violation of the Fourth Amendment. Alternatively, he argues that his detention at the American Airlines terminal constituted an illegal arrest, not supported by probable cause, and therefore the evidence must be excluded as it was a search incident to an unlawful arrest.

### A.Extended Border Search

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const., Amend IV. Generally a search is not reasonable unless the government has a warrant supported by probable cause or there must be an exception to the warrant requirement. An administrative border search has long been recognized as such an exception. United States v. Ramsey, 431 U.S. 606, 619 (1977). Thus an administrative border search is constitutional so long as it is reasonable. See United States v. Chaidez, 919 F.2d 1193, 1196 (7th Cir. 1991). Routine searches without a warrant at this country's international borders are per se reasonable. Ramsey, 431 U.S. at 616. Courts have predicated this broad power to conduct searches at international borders on the sovereign's legitimate interest in protecting its borders. Id. See also United States v. Brignoni-Ponce, 422 U.S. 873, 887 (1975) (Rehnquist concurring) (noting that a border search without probable cause is necessary for national protection)./1

O'Hare Airport is an international gateway into the United States, and

incoming passengers from international ports are subject to border searches because the airport is the functional equivalent of an international border. United States v. Johnson, 991 F.2d 1287, 1290 (7th Cir. 1993) (holding that weight, flex and scratch tests performed on luggage by a customs agent at O'Hare were routine). Under the "functional equivalent" doctrine, routine border searches are constitutionally permissible at places other than actual borders where travelers frequently enter or exit the country. See United States v. Almeida-Sanchez, 413 U.S. 266, 272-73 (1973). Thus even though Chicago is not an international border, searches at customs at O'Hare are permissible under the functional equivalent doctrine.

   In this case, Teng was routinely searched at customs and no contraband was discovered in his luggage. It was not until he traveled to a different terminal that other circumstances caused customs agents to develop suspicion that he might be smuggling drugs into the country. Teng argues that because the search that revealed the contraband did not occur at customs, it was not a constitutionally permissible border search. His argument is that once a traveler has passed through customs, left the international terminal, proceeded to a separate terminal in the airport and checked his bags onto another flight, the opportunity for a "routine" border search has passed. The government contends, on appeal, that even though Teng had passed through customs, the search should still be described as a routine border search, relying on United States v. Ramos, 645 F.2d 318, 319-21 (5th Cir. 1981). In Ramos, a search of an airline passenger who had traveled past customs but was still in the airport was deemed a routine search. In that case, once Ramos had passed through customs he proceeded to a hotel that was part of the same terminal. Id. Customs agents stopped Ramos in the hotel lobby, less than a half-hour after he had passed through customs and before he had an opportunity to go to his room. Id. The court reasoned that the search was routine because the passenger had not yet been assimilated into the "mainstream of domestic activities so as to shield him from appropriate border examinations and searches." Id. See also United States v. Ogbuehi, 18 F.3d 807, 813 (9th Cir.

1994) (holding that a search conducted minutes after a defendant had crossed the border and was less than sixty feet from the border was a routine border search); United States v. Wardlaw, 576 F.2d 932, 935 (1st Cir. 1978) (finding that when a suspect has merely passed through a luggage inspection but not yet left the site of the border a secondary inspection is still a routine border search). Whether, under the facts before us, this is a routine border search is a close question. But because the search may be justified as a nonroutine extended border search, we need not address whether, under these circumstances, it could still be described as a routine border search.

The district court held that this search was not a routine border search, but was justified under the extended border doctrine, a doctrine our own circuit has not examined or applied. United States v. Odland, 502 F.2d 148, 151 (7th Cir. 1974) (recognizing the existence of, but expressing no view on the extended border doctrine). The extended border doctrine provides that non-routine border searches that occur near the border are deemed constitutionally permissible if reasonable under the Fourth Amendment. To determine whether an extended border search is reasonable courts consider whether: (1) there is a reasonable certainty that a border crossing has occurred; (2) there is a reasonable certainty that no change in condition of the luggage has occurred since the border crossing; and (3) there is a reasonable suspicion that criminal activity has occurred. See United States v. Espinoza-Seanez, 862 F.2d 526, 531 (5th Cir. 1988). The "extended border search doctrine" has been adopted by several other circuits. See Espinoza-Seanez, 862 F.2d 526 (5th Cir. 1989); United States v. Caicedo-Guarnizo, 723 F.2d 1420 (9th Cir. 1984); United States v. Garcia, 672 F.2d 1349 (11th Cir. 1982); United States v. Bilir, 592 F.2d 735 (4th Cir. 1979). Two additional circuits have recognized it as a valid doctrine but have not yet applied it in justifying a border search. See United States v. Hyde, 37 F.3d 116, 120 n.2 (3d Cir. 1994); United States v. Glaziou, 402 F.2d 8, 13-14 n.3 (2d Cir. 1968).

The constitutional concern of extending the border in this manner is that it

potentially permits searches with less than probable cause at significant distances from our national borders. For example in Caicedo-Guarnizo, a suspect was searched in Los Angeles after he had passed through customs in New Orleans and changed flights en route in Houston. The court allowed a search in that case under the extended border doctrine, even though several hours and over a thousand miles had passed since his border crossing. Caicedo-Guarnizo, 723 F.2d at 1423. The court allowed the search primarily because the suspect was under constant surveillance from the time he exited customs in New Orleans to the time he landed in Los Angeles. See id. at 1422. See also, United States v. Fogelman, 586 F.2d 337 (5th Cir. 1978) (extended border search allowed 254 miles and 20 hours from observed border crossing); United States v. Martinez, 481 F.2d 214 (5th Cir. 1973) (extended border search 150 miles and 142 hours from observed border crossing). Because an extended border search entails greater intrusion on an entrant's legitimate expectations of privacy than does a search conducted at the border or its functional equivalent, courts have instituted the three-part test to ensure that the search is reasonable. United States v. Cardenas, 9 F.3d 1139, 1148 (5th Cir. 1994). The test ensures that a suspect still has a significant nexus with a border crossing so that agents can reasonably base their search on statutory and constitutional authority./2 Searches are reasonable under the extended border doctrine when officers have a reasonable certainty that any contraband found on a suspect was not obtained after the border crossing. See United States v. Corral-Villavicencio, 753 F. 2d 785, 788 (9th Cir. 1985). Because of the required relationship with a border crossing, the extended border doctrine respects "basic Fourth Amendment concepts by striking a sensible balance between the legitimate privacy interests of the individual and society's vital interest in the enforcement of customs laws." See Caicedo-Guarnizo, 723 F. 2d at 1422. The use of the doctrine in this case where Teng attempted to smuggle opium is especially appropriate in light of the fact that "[t]he major impetus behind the extended border search doctrine is 'the government interest in stopping drug traffic.'" See Cardenas, 9 F.3d at 1149 (citing William E. Ringel,

Searches and Seizures, Arrests and Confessions sec. 15.3, at 15-20 (Supp. 1993)); see also Bilir , 592 F.2d 735, 740 (4th Cir. 1979) (stating "[t]he many difficulties that attend the attempt to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers at the very borders of the country have of course given birth to the doctrine"). Teng's plan to import opium was very sophisticated in this case, considering that even an x-ray of his luggage did not reveal the presence of contraband.

Finally, the use of the extended border doctrine allows this circuit to more effectively analyze the reasonableness of non-routine border searches that occur near the border. Previously, in a case concluding that a border search was routine, this circuit observed that non-routine border searches need at least be supported by reasonable suspicion. See Johnson, 991 F.2d at 1291. In Johnson, the court examined the reasonableness of an in-depth search, including a luggage x-ray, of a passenger and her luggage while at customs at O'Hare Airport. Id. at 1291-94. The court noted that whether or not a border inspection is routine depends on the "degree of intrusion into a border entrant's legitimate expectations of privacy." Id. at 1291 (citing United States v. Braks, 842 F.2d 509, 511-12 (1st Cir. 1988)). However, this type of analysis does not lend itself easily to the situation at hand. As the district court noted "it is not disputed that the search of Teng was [n]onroutine." Here, customs inspectors detained Teng at a completely different airport terminal than the international terminal after Teng had already been subjected to a routine border search. Be cause the search of Teng did not occur at the border, but rather near the border, the reasonableness of the search is more aptly analyzed under the extended border search doctrine.

It is the enforcement of the customs laws combined with the mandate of protecting the borders of the United States that permits the extension of the search rights of border authorities to allow non-routine searches in areas near our nation's borders. Because the extended border doctrine strikes a sensible balance between these two

interests we conclude that it is a valid legal standard applicable in this circuit. Thus, we now consider the relevant factors under this standard for determining the constitutionality of this search.

1. Reasonable certainty of a border crossing.

First, we ask whether there is a reasonable certainty that a border has been crossed. "Reasonable certainty is a standard which requires more than probable cause, but less than proof beyond a reasonable doubt." See Cardenas, 9 F.3d at 1148 (citing United States v. Delgado, 810 F.2d 480, 484 (5th Cir. 1987)). Teng was seen passing through customs by customs officials and his bags were x-rayed as part of an agricultural check. The same customs officer who identified him in customs also spotted him in the American Airlines terminal less than an hour later. In this case neither party disputes this factor and there is not even a question that Teng crossed the border.

2. Reasonable certainty of no change in condition of his luggage.

Next, we must determine whether there was a reasonable certainty that no change in the condition of the luggage occurred since the border crossing. Again, neither party disputes this element. Teng claims he carried his own bags, via the O'Hare airport tram, to the American Airlines terminal. At the terminal, he waited in line at the gate and checked his own bags./3 Airport personnel then removed his bags from the plane, where they were identified by Teng. Teng does not contest this factor and does not allege any circumstances in his affidavit where his luggage would have changed condition. While neither party disputes this element, it is this factor that establishes the proper nexus with the border to allow a search and so we will examine it accordingly.

Other circuits have considered the totality of the circumstances in determining whether officers had a reasonable certainty that any contraband discovered in a search was in the

possession of the suspect at the time the suspect crossed the border. See United States v. Alfonso, 759 F.2d 728, 735 (9th Cir. 1985). Circumstances that courts consider include the time and distance from the original entry and the manner and extent of surveillance. Id. In a case with facts similar to this one, the Ninth Circuit upheld the search of a suspect even though he had passed through airport customs 90 minutes prior to the search and was not under surveillance. See United States v. Mejias, 452 F.2d 1190, 1192-94 (9th Cir. 1971). The court reasoned that the subject's luggage did not look like it had been tampered with and he was found near the customs terminal. Id. Similar to the subject in Mejias, Teng was not under surveillance for the 30- to 45-minute period from the time when he crossed the border to the time when his luggage was searched. Unlike Mejias, Teng was found at a different terminal. However, because he had to check in his bags at the second terminal, his luggage was out of his control for a significant portion of the time that elapsed from when he crossed the border.

At some point a subject's relationship with the border becomes so attenuated that customs officials lose the right to detain him without a warrant. See Caicedo-Guarnizo, 723 F.2d at 1423. But in this case that limit was not reached. Admittedly, the fact that Teng was found at a different terminal does increase the possibility that the contents of his luggage had changed, but not substantially. Based on the relatively short period of time between Teng's border crossing and his apprehension, the proximity to the border and the fact that Teng's luggage was in control of the airport personnel for a significant period of this time indicates that customs agents had a reasonable certainty that the condition of Teng's luggage did not change from the time of the border crossing.

3. Reasonable suspicion of criminal activity.

Last, we examine whether customs inspectors had reasonable suspicion that Teng was involved in criminal activity. Teng contends that the only reason that

he was stopped and his luggage was searched was that his traveling companion was caught with drugs, and that this is not enough to create a reasonable suspicion that he was involved in criminal activity. The government responds that in addition to drugs being found in Lee Pao 's bag, both were traveling on the exact same itinerary from Laos, a drug source nation, to St. Paul, Minnesota, a known opium destination, and that Teng failed to respond when his name was called on the speakers. After considering the evidence presented in the evidentiary hearing, the district court concluded that a reasonable suspicion existed to detain Teng and search his bags./4

This final factor in the "extended border search" doctrine is analogous to a Terry stop. See United States v. Lopez-Gonzalez, 916 F.2d 1011, 1013 & n. 3 (5th Cir. 1990) (explaining that factors relevant to the reasonable suspicion inquiry for a Terry stop might also be relevant to the reasonable suspicion inquiry in an extended border search, particularly for those stops in which the transportation of contraband is suspected). Under Terry, the detention of an individual or a luggage search without a warrant is permissible under the Fourth Amendment where there is reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 20-23 (1968); United States v. Place, 462 U.S. 696, 708 (1983). Reasonable suspicion "of criminal activity must be based on specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant [an] intrusion." United States v. Mancillas, 183 F.3d 682, 695 (7th Cir. 1999) (citations omitted).

The suspicion justifying a search of this type must be "based on objective factors and judged in light of the experience of the customs agents." United States v. Dorsey, 641 F.2d 1213, 1219 (7th Cir. 1981). An illustrative, but not exhaustive, list of these factors appears in United States v. Asbury, 586 F.2d 973, 976-77 (2d Cir. 1978). That list includes "nervous or unusual conduct, tips from informants, loose clothing, travel itinerary, lack of employment, discovery of incriminating matter during routine searches, information from a search or

interrogation of a traveling companion, inadequate luggage, and evasive or contradictory answers." Dorsey, 641 F.2d at 1219, n.12 (citing Asbury, 586 F.2d at 976-77). Here, Teng evaded contact with the authorities at the terminal, they learned his itinerary from his traveling companion, and had discovered a significant amount of drugs on his companion. Additionally, the officers knew that Laos was a source country for opium and that St. Paul was a common destination for opium in the midwest. All of these factors, when considered in concert, demonstrate reasonable suspicion that criminal activity was occurring. See Cardenas, 9 F.3d at 1151 (holding that finding drug paraphernalia on a traveling companion who had recently traveled from the Philippines, combined with suspicious behavior, constituted reasonable suspicion for the purposes of an extended border search).

Therefore, under the extended border search doctrine, we conclude that the search of Teng was reasonable under the Fourth Amendment. Officers had a reasonable certainty that Teng had crossed the border and that his luggage had not changed in condition, and they had a reasonable suspicion that criminal activity was occurring.

B. Search Incident To An Arrest

We now turn to Teng's alternative argument, that the evidence should be excluded because it was obtained in a search incident to an unlawful arrest. The district court concluded that Teng was not under arrest when he was handcuffed and returned to the international terminal. Teng argues that he was arrested without probable cause prior to the search of his luggage and therefore the evidence recovered from his luggage should be suppressed as the fruit of an unlawful arrest. Generally, when police actions create a situation that exceeds a short detainment, a stop becomes an arrest which requires probable cause that the person is committing or has committed a crime. Beck v. Ohio, 379 U.S. 89, 96-97 (1964). Because we have already determined that the search of the luggage was reasonable under the extended border search doctrine, this issue is irrelevant. See United States v. $73,275.00, 710 F.2d 283, 287-90 (7th

Cir. 1983) (holding that the seizure of currency was lawful where defendant argued that the evidence was fruit of an unlawful seizure, yet the court found that the search was lawful on other grounds).

Nevertheless, we would agree with the district court's analysis. The detention of Teng was necessary and limited in scope and duration, and the handcuffing and transportation of Teng back to the international terminal did not convert the stop into an arrest. This case is different from our previous case law in this area, see, e.g., United States v. Glenna, 878 F.2d 967 (7th Cir. 1989) (ruling that the use of handcuffs did not transform an investigatory stop to an arrest when the officer's safety was at risk), because Teng himself did not pose a threat to the officers nor a flight risk. But it still does not fall into the category of cases where the use of handcuffs transforms an investigatory stop into an arrest. Under these facts and in this unique situation, the use of handcuffs was reasonable. First, Teng was only handcuffed during the drive across the airport tarmac, and the handcuffs did not increase his level of confinement given the fact that he was already confined in a customs vehicle. The transportation was of a short duration and necessary to confirm the officers' suspicions given that the drug testing equipment was at the customs office. Finally, because the transportation occurred in a volatile area, the circumstances here are quite unique. The car was driven in the highly restricted tarmac area where planes are taxiing and baggage trains are rolling. Risk to the driver and everyone else in the restricted area would be extreme if an unauthorized person were to take control of the vehicle and drive erratically. Safety and common sense allow this extra precaution with an unknown passenger whose movement is already restricted when he is riding in the car. Because of these dangers, it is customs policy to usehandcuffs while transporting individuals across the tarmac. Given these unique facts, the district court was correct in finding that Teng was not under arrest when he was transported to the customs office in handcuffs.

III. Conclusion

The search of Teng's luggage was reasonable under the extended border search doctrine. The agents had a reasonable certainty that he had crossed the border and that his luggage had not changed condition, and they had a reasonable suspicion that criminal activity was occurring. In addition, because Teng was not arrested prior to the search, it was not a search incident to an unlawful arrest. For these reasons, we affirm the district court.

FOOTNOTES

/1 While this case does not involve issues of national security that might be implicated by terrorist activities, the events of September 11, 2001, only emphasize the heightened need to conduct searches at this nation's international airports. "[A]ttempts to counter foreign threats to the national security require the utmost stealth, speed and secrecy." United States v. Truong Ding Hung, 629 F.2d 908, 913 (4th Cir. 1980) (adopting the foreign intelligence exception to the Fourth Amendment). Searches without probable cause can be constitutional "when special needs, beyond the normal needs for law enforcement make the elements of a warrant and probable cause requirement impracticable." Veronia School District 47j v. Acton, 515 U.S. 646, 653 (1995) (citations omitted). We now know the serious threats that our border agents need to guard against and we must be mindful of the special needs of the agents in responding to those threats.

/2 Customs agents have the statutory authority to conduct searches pursuant to 19 U.S.C. sec. 482. The statute allows searches of individuals "wherever found" with reasonable cause to believe that the suspect has items that were imported into the country "contrary to law." Id. The phrase "wherever found" is not infinite in scope but has been interpreted to be limited by Fourth Amendment reasonableness constraints. See Bilir, 592 F.2d at 739, n. 6.

/3 Typically, once a passenger leaves customs at O'Hare there is an opportunity within the international terminal to immediately check luggage with any connecting airlines. If Teng had taken advantage of the immediate check-in area then there would be little doubt that his luggage was in the same condition when it was searched by the agents as it was when it crossed the border because it would have been out of his control. The agents were not aware at the time that his luggage was pulled from the plane whether he had

checked his own bags at the American Airlines terminal or the international terminal. It is also unclear whether or not they could have learned this information from Teng due to his limited ability to speak English.

/4 The district court did not specifically mention in its ruling that Teng's failure to respond to the page at the American Airlinesterminal contributed to the suspicion of the officers. Also, the court did not mention that when he spotted Teng, the inspector noticed Teng was "kind of hunched over and trying to stay out of sight." However, this information was disclosed during the direct examination of Inspector Joseph Marcocig during the evidentiary hearing on the motion to suppress. Inspector Marcocig was subsequently cross-examined by Teng's attorney. Even if the district court did not mention these facts, this court may consider them in examining the totality of the circumstances that led to stopping Teng. See United States v. Brown, 232 F.3d 589, 594 (7th Cir. 2000) (stating that in determining whether an officer had reasonable suspicion to stop a suspect we "'look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious.'"(emphasis added) (citations omitted)); see also United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994) ("In reviewing a suppression motion, we may consider evidence introduced both at the pretrial hearing and at the trial itself.").