OPINION
SUTTON, Circuit Judge.
At issue in this case is the legality under the Fourth Amendment of the detention and search of a woman (and her luggage) by customs officials after she had entered the country. Because the officials obtained information soon after she passed through customs that gave them an objectively reasonable basis for suspecting that she had smuggled more than $10,000 in cash into the country without declaring it — the arrest of her traveling companion on similar charges, an incriminating statement and suspicious behavior — we uphold the search and reverse the district court’s contrary decision.
I.
At 3:15 p.m. on April 2, 2005, Northwest Airlines flight 57 from Amsterdam arrived at Memphis International Airport. Like all passengers arriving in Memphis, Deborah McGinnis and her traveling companion, Michael Ely, passed through the primary customs-inspection station where customs agents stamped their passports and reviewed their declaration forms. At that point, customs officers directed McGinnis and Ely to the secondary inspection area.
At approximately 3:40 p.m., customs officer Brian Hooper conducted the secondary inspection of McGinnis. She handed him her customs-declaration form, on which she had marked “no” in answering whether she was carrying currency or monetary instruments totaling $10,000 or the foreign equivalent of that amount. She showed Hooper a U.S. Department of Defense contractor card as proof of identity and told him that she had been in Kuwait and Iraq. He informed her of the $10,000 currency limit, telling her “it wasn’t illegal to carry as much money as you wanted, but if it was more than $10,000, you had to declare it and fill out a form.” JA 118. McGinnis again denied that she was carrying more than $10,000, stating that “she was carrying 3000 U.S. dollars.” Id.
After Hooper asked to see the cash she had brought into the country, McGinnis produced a “small stack of money” from her purse, which Hooper thought was consistent with $3,000. JA 119. He searched McGinnis’s checked luggage, found nothing and released her at 4:05 p.m.
Although McGinnis was free to leave the federal inspection station, she waited for Ely, whom customs agents were still detaining some 15-20 feet away. McGinnis remained in the inspection area for “[a]t least 30 minutes,” then “left on her own.” JA 126.
Meantime, while Ely had declared on his customs form that “he was carrying between $6[000] and $7000,” an initial inspection of his luggage turned up more than $13,000. JA 194. Customs official Raymond Polley recalled seeing McGinnis still standing in the federal inspection area after officers made this discovery. Customs official Blaine Crum spoke briefly with Ely, who told him that “he had grabbed a quantity of money out of the safe and he didn’t know how much money he had grabbed.” Id. Crum instructed officers to conduct another search of Ely’s luggage.
The second search uncovered an additional $11,000 hidden in Ely’s bags. After being handcuffed, Ely admitted that he had stuffed approximately $2,500 in his back pocket. All told, Ely had attempted to smuggle $24,088 in U.S. and foreign currency into the country.
*591 Polley gave Ely two options: He could let the airline hold onto his luggage, or he could give it to his traveling companion. Ely chose to ask McGinnis to look after his luggage. The officials paged McGinnis, and Polley told her that they had arrested Ely and that he wanted her to retrieve his luggage. Polley sent two customs officers in a van to pick up McGinnis in B Concourse (1,582 feet from the inspection station) and to bring her back to the customs area. The officers found her at the front of the airport near the Northwest Airlines ticket counter. McGinnis told one of the officers — Todd Key — that she was on a 30-day leave from Iraq, that she had been traveling for 4 days, that she planned to spend 2 days in Memphis and that she had been “getting tickets for the next leg of her trip.” JA 180.
After McGinnis and the officers reentered the federal inspection station at approximately 6:00 p.m., Key explained the “currency reporting requirements” to McGinnis: “I advised [her] it’s okay to carry any amount of currency in and out of the United States,” but if she had “over $10,000” she “would have to fill out a CMIR [Currency or Monetary Instruments Report], and she advised that she thought she would be taxed on the money” if she reported it. JA 181. Key shared McGinnis’s comments with Crum.
While McGinnis was sitting in the secondary inspection area waiting to pick up her travel companion’s luggage, Polley observed that she “seemed very nervous.... She was fidgety, her face was somewhat flushed. She seemed to be perspiring a little bit,” JA 146; Key observed that “[s]he was looking around a lot.... [H]er face was kind of flustered and it was a little red and she was kind of sweating,” JA 182, and described her as “visibly nervous” while he was questioning her, JA 187; Crum indicated that “[s]he appeared nervous, she was sweating, she was fidgety, red faced, flushed,” JA 197. Suspicious that McGinnis “might possibly have money also,” id., Crum, who had already learned of McGinnis’s tax comment from Key, spoke with Polley, then instructed Key and another officer to get McGinnis’s luggage out of the van and bring it inside for reinspection.
Just before or at roughly the same time as the reinspection of McGinnis’s luggage, Polley asked McGinnis “whether things had changed in regard to her bags or whether she had acquired additional funds while she was in the airport.” JA 146. McGinnis said she did not acquire or exchange money. While the officials questioned McGinnis, the money seized from Ely’s luggage sat on a table in front of them.
Polley asked McGinnis again how much money she possessed. She told him she had $5,000. Polley asked if McGinnis wanted to amend her customs declaration and “she advised [him] she was carrying $12,000 to be on the safe side.” JA 184. Inspectors searched her luggage and found $17,358-$16,396 in U.S. currency and $962 in Kuwaiti currency. McGinnis said she had obtained the money when she “closed out a bank account in Kuwait” before traveling to the United States. Id.
On April 14, 2005, a federal grand jury indicted McGinnis on charges of “bulk cash smuggling” into the United States, see 31 U.S.C. § 5332(a), and making a false statement to a federal officer, see 18 U.S.C. § 1001(a)(2). McGinnis filed a motion to suppress all evidence obtained as a result of her detention and the search of her luggage. Following a two-day suppression hearing, the district court granted the motion.
II.
McGinnis urges us to dismiss the appeal on the ground that the government *592 failed to comply with 18 U.S.C. § 3731, which requires the U.S. Attorney to certify to the district court “that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.” Id,.; see United States v. Smith, 263 F.3d 571, 577 (6th Cir.2001). The district court entered the order granting McGinnis’s motion to suppress on February 24, 2006, 2006 WL 463868. The United States filed its notice of appeal on March 27 but did not file the required certification until July 19, several weeks after the 30-day period for doing so had expired. The government admits that it failed to file the certificate when it should have, explaining that the attorney handling the case mistakenly believed that the certification should be filed after the U.S. Solicitor General had authorized the appeal. The attorney filed the certification after he received this authorization.
The government’s failure to file a timely certificate, we have said, is “an irregularity in perfecting the appeal.” Smith, 263 F.3d at 578. In addressing this irregularity, we look to Appellate Rule 3, see id., which gives us discretion to dismiss or hear the appeal, see Fed. R.App. P. 3(a)(2) (stating that “[a]n appellant’s failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal”). Several considerations guide this exercise of discretion: (1) the reason for the tardiness, (2) whether the government “engage[d] in a conscientious pre-appeal analysis,” (3) whether the government concedes that the “certification requirement should be taken seriously,” (4) whether the tardiness causes “any delay or prejudice to the defendant” and (5) “whether the appeal should be heard in the interest of justice, or for any other significant reason.” Smith, 263 F.3d at 578.
Due consideration of these factors does not require us to dismiss the appeal. The government offered a good-faith and reasonable (though in the end ill-founded) explanation for the delay — the attorney’s mistaken belief that the Solicitor General’s office must approve the appeal before the certification could be filed. The government obtained declarations from the First Assistant U.S. Attorney for the Western District of Kentucky and from the Chief of the Criminal Division, indicating that the government had engaged in a conscientious analysis of the case before appealing it. The government attorney handling the case has emailed all attorneys in the U.S. Attorney’s office for the Western District of Tennessee to remind them of the certification requirement, showing that the government takes the certification requirement seriously. See United States v. Bates, 146 Fed.Appx. 795, 798 (6th Cir.2005) (addressing merits of appeal due to the government’s “good-faith efforts to comply with [Section 3731]”). And the only prejudice McGinnis has suffered is “pre-trial release and all the restrictions and burden that go along with it,” Br. at 7, which by itself does not justify dismissing the appeal, see Smith, 263 F.3d at 580 (declining to dismiss the appeal despite defendant’s claims of prejudice from “the harm of delay” and from the fact that “pre-trial release is a deprivation of liberty”).
III.
The Fourth Amendment says:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to *593 be searched, and the persons or things to be seized.
U.S. Const, amend. IV. Two accepted applications of the guarantee frame today’s dispute. At one extreme: police officers may not seize individuals minding their own business on a public street and search their belongings without probable cause and a warrant — or at least reasonable suspicion under some circumstances. See Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality) (noting that absent probable cause and a warrant, a “person approached [by police] ... need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way”); Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam) (noting that “[w]hile the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person’s liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity”); Terry v. Ohio, 392 U.S. 1, 9, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
At the other extreme: customs officials may stop and search individuals and their luggage before they board any airplane or when they enter the country by air without a warrant and without reasonable suspicion or probable cause. See United States v. Montoya de Hernandez, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Border searches “are reasonable simply by virtue of the fact that they occur at the border,” United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), where the sovereign has a right to “regulate the collection of duties and to prevent the introduction of contraband into this country,” Montoya de Hernandez, 473 U.S. at 537, 105 S.Ct. 3304. See United States v. Flores-Montano, 541 U.S. 149, 152-53, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004); United States v. Lawson, 461 F.3d 697, 699 (6th Cir.2006).
Between the extremes: while the ban on “unreasonable searches and seizures” gives law enforcement more latitude to search and seize travelers (and their luggage) as they board airplanes and as they enter the country by air, it still has force within an airport. Law enforcement may not search people and their luggage simply because they happen to be in an airport. See, e.g., Royer, 460 U.S. at 507-08, 103 S.Ct. 1319. And even when law enforcement has a legitimate ground for searching an individual or her suitcase, the length and manner of the detention still may violate the Fourth Amendment. See, e.g., United States v. Place, 462 U.S. 696, 709-10, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).
This case lies between the extremes. What happens when the individual has crossed the border (and customs officials already have exercised — or chosen not to exercise — their right to conduct a suspicion-less search of the individual or her luggage), when the individual has not left the airport and when customs officials learn that her traveling companion has attempted to smuggle items illegally across the border? May customs officials bring the individual back to the “border” inspection station and search her as if she had never crossed the border? May they stop and search her based only on the suspicion that arises from guilt by traveling association? Or must the officials satisfy a reasonable-suspicion or probable-cause requirement, which may allow them to consider the misdeeds of a traveling companion but will not allow them to rely on those misdeeds alone?
While we have not faced this fact pattern, other circuits have and, in doing so, they have adopted something called the “extended border search doctrine.” See, e.g., United States v. Yang, 286 F.3d 940, *594 949 (7th Cir.2002) (upholding search of defendant airline passenger as valid extended-border search after his travel companion was caught with drugs despite the fact that defendant himself had already passed through customs); United States v. Cardenas, 9 F.3d 1139, 1153 (5th Cir.1993) (holding that second search of defendant was valid under extended-bordersearch doctrine even though defendant had already passed through customs and was brought back to the border checkpoint after a search of her travel companion netted suspected drug-smuggling paraphernalia); United States v. Caicedo-Guarnizo, 723 F.2d 1420, 1422-23 (9th Cir.1984) (determining that search of defendant airline passenger who entered the country via New Orleans, then flew to Houston and on to Los Angeles was valid extended-border search); United States v. Garcia, 672 F.2d 1349, 1366-67 (11th Cir.1982) (concluding that search of an unidentified plane and its passengers was a valid extended-border search even though the plane landed twice before the search and the passengers ran into the woods and officers did not locate the passengers for more than an hour); United States v. Bilir, 592 F.2d 735, 741 (4th Cir.1979) (deeming “deliberately delayed search” of a ship valid as extended-border search); see also United States v. Caminos, 770 F.2d 361, 364-65 (3d Cir.1985) (discussing extended-border-search doctrine but instead upholding search as valid “functional equivalent” of the border search); United States v. Glaziou, 402 F.2d 8, 14 n. 3 (2d Cir.1968) (discussing extended-border-search doctrine but instead upholding the search in question as a valid border search, not as an extended-border search).
The upshot of these cases is to treat the encounters not as border searches (in the sense that no suspicion is required) and not as run-of-the-mine searches (in the sense that a warrant and probable cause are required) but as searches that require something in between — reasonable suspicion. See, e.g., Yang, 286 F.3d at 945. While this standard imposes a limit on customs officials after the individual has crossed the border, it relaxes the normal requirements of a warrant premised on probable cause in recognition of the “many difficulties that attend” customs officials’ “attempt[s] to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers,” Bilir, 592 F.2d at 740, and enables them to delay apprehending suspected smugglers “in circumstances where surveillance may lead them to ‘higher ups’ or other cohorts in the illegal enterprise,” United States v. Niver, 689 F.2d 520, 526 (5th Cir.1982) (internal quotation marks omitted).
In deciding whether to uphold an extended-border search as reasonable, courts generally have asked three questions: (1) did the individual cross the border? (2) did law enforcement seize the individual and her luggage sufficiently soon after the crossing to be reasonably confident that the condition of the individual and her luggage did not change after the border crossing? and (3) does law enforcement have a reasonable suspicion that the individual violated a criminal law? See, e.g., Yang, 286 F.3d at 945; see also United States v. Espinozar-Seanez, 862 F.2d 526, 531 (5th Cir.1988) (applying similar test); Alexander v. United States, 362 F.2d 379, 382 (9th Cir.1966). The salient question is whether “reasonable suspicion” of criminal activity exists, paying special attention to whether the suspected criminal activity relates to a recent border crossing (e.g., smuggling as opposed to a murder charge) and whether the search occurred sufficiently close in time to the border crossing as to eliminate the risk that the individual obtained the contraband after the crossing. Except for the dice-loading name of the rule — an “extended border search” doctrine suggests that suspicion is never re *595 quired in the same way that an “extended house search” doctrine would suggest that probable cause is always required — -we adopt our sister circuits’ general approach to this issue.
The search of McGinnis satisfies these requirements. First, no one questions that McGinnis crossed the border. She had just traveled by plane from Amsterdam and crossed the “border” at the Memphis International Airport.
Second, the customs officials had a reasonable basis for concluding that the condition of McGinnis’s luggage had not changed by the time of the search. The illegal contraband was the $17,358 in cash that McGinnis hid in her luggage and refused to declare when asked to do so. McGinnis never left the airport terminal. While waiting for Ely, she went to “get[ ] tickets for the next leg of her trip,” JA 180, which at most would have permitted her to spend money, not to get more of it. It suspends reality to think that McGinnis could have acquired the necessary additional cash — over $7,000 — to trigger the currency reporting requirement between the time she exited the inspection area and the time officers came to pick her up to take her back to customs — at most 1 hour and 35 minutes. See JA 125-26, 129-30, 144, 201. Obtaining more than $7,000 in an airport in general or at an ATM in particular in such a short time span strikes us as a daunting, if not a nearly impossible, task. See generally Yang, 286 F.3d at 948 (valid search even though defendant was not under surveillance in the airport for up to 45 minutes); United States v. Mejias, 452 F.2d 1190, 1192-93 (9th Cir.1971) (valid search even though 90 minutes had elapsed since defendant, who was not under constant surveillance, passed through customs at airport); of. United States v. Ramos, 645 F.2d 318, 320-21 (5th Cir.1981) (valid search even though 30 minutes elapsed after defendant cleared airport customs and defendant had checked into an airport hotel); United States v. Walters, 591 F.2d 1195, 1198 (5th Cir.1979) (valid search even though 55 minutes elapsed after defendant cleared airport customs and defendant was not under surveillance during that time).
Third, customs officials had reasonable suspicion that McGinnis had engaged in criminal activity. See Terry v. Ohio, 392 U.S. 1, 20-23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Yang, 286 F.3d at 949 (noting that the “final factor in the extended border search doctrine is analogous to a Terry stop”) (internal quotation marks omitted). We agree with the district court, as an initial matter, that guilt by association does not by itself suffice to establish the reasonable suspicion necessary to seize and search an individual who already has passed through customs. D. Ct. Op. at 24-25. But there was more to the customs officials’ suspicion than that: McGinnis and her traveling companion were returning to the United States from Kuwait and Iraq, where McGinnis was a Department of Defense contractor and where officials could reasonably infer (as they did) that she earned an ample salary; and as McGinnis sat in the customs area after returning to pick up Ely’s luggage, multiple officers noticed she “seemed very nervous,” JA 146, was “perspiring a little bit,” id., and “was fidgety, red faced, flushed,” JA 197. More suspicious than all of this, however, was McGinnis’s remark after Key “advised [her] it’s okay to carry any amount of currency in and out of the United States” as long as it is reported. JA 181. In response, she said “that she thought she would be taxed on the money” if she reported it. Id. We can conceive of no other way to interpret McGinnis’s words — and McGinnis has given us none on appeal — than that she had hidden some amount of money from customs officials to avoid paying taxes on it. This incrimina *596 ting comment, together with the other circumstances, gave customs officials ample grounds for reasonably suspecting that criminal activity was afoot.
McGinnis argues that she could have obtained additional funds during the time she was “unobserved” following her exit from the customs-inspection area. Br. at 39. To the extent she means to argue that the lack of continuous surveillance prohibits us from upholding the search as proper, no case to our knowledge supports her conclusion. See Cardenas, 9 F.3d at 1150 (stating that “continuous surveillance is not a requirement of an extended border search”); see also Yang, 286 F.3d at 948 (noting that “extent of surveillance” is one of the “[c]ircumstances that courts consider” but upholding search despite 30-45 minute break in surveillance); Caicedo-Guamizo, 723 F.2d at 1422 (listing “the continuity of surveillance over the suspected smuggler” as one “of the circumstances that the fact finder should consider” but upholding search despite some “interruptions in the surveillance” of the defendant); Mejias, 452 F.2d at 1192-93 (upholding search despite 90-minute gap in surveillance and noting prior cases “sustain[ing] the validity of border searches conducted away from the actual border in spite of substantial lapses in surveillance”).
Nor can McGinnis tenably argue that the search was invalid on the ground that customs officials decided to reinspect her luggage before she expressed concern about having to pay taxes on unreported money and before she exhibited nervous behavior. Although Polley testified that “the decision to re-examine [McGinnis’s] luggage was probably decided upon prior to her return” to the customs-inspection area, JA 172, Blaine did not order officers to obtain McGinnis’s luggage from the van and begin searching it until after he learned about her tax comment from Key and after he noticed her nervousness, as shown through this exchange during the suppression hearing:
“Q: ... At the time that you directed the officers to bring her luggage back in, did you know that she had crossed the border?
A: Yes, sir, I did.
Q: Did you know that Mr. Ely had for certain 13,000 and you were finding more money all the time in his luggage?
A: Yes, sir.
Q: And at that time, before you ordered her luggage to come back in, did you — had you observed her physical condition?
A: Yes, sir, I did.
Q: And had you already talked to Officer Key about the statements she made about I thought I would be taxed if I declared it?
A: Yes, sir.
JA 207; see also JA 198 (Blaine testifying that McGinnis’s luggage “was still in the van” when “Officer Key advised [him] about the statement Ms. McGinnis made about she was worried about her money being taxed”); JA 197-98 (Blaine testifying that he “had a brief conversation with Ms. McGinnis” when she returned to the inspection area, that she “appeared nervous, she was sweating, ... fidgety, red faced, flushed” and that while he was speaking with her, her luggage “was still in the van”). Thus, by the time he ordered the search, Blaine knew all of the facts that we already have deemed sufficient to spark reasonable suspicion that McGinnis was smuggling currency into the country. More to the point, we do not judge the validity of Fourth Amendment searches based on the state of mind of the arresting officers. See Whren v. United States, 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (“[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations *597 of individual officers.”); see also Arkansas v. Sullivan, 532 U.S. 769, 772, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001) (reiterating Whren’s holding that “subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis”) (internal quotation marks and brackets omitted); Bond v. United States, 529 U.S. 334, 338 n. 2, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (noting that “[t]he parties properly agree that the subjective intent of the law enforcement officer is irrelevant in determining whether that officer’s actions violate the Fourth Amendment”).
In reaching a contrary conclusion, the district court focused on the difference between cash smuggling and drug smuggling. It placed substantial weight on the fact that “the substance being carried by [McGinnis and] her companion was not an illegal controlled substance” and “she was not flying from a source country for illegal substances.” D. Ct. Op. at 24. But customs officials have no less right to be vigilant in investigating the one crime over the other.
IV.
For these reasons, we reverse and remand the case for further proceedings.