*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0367p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant,*

    *v.*

DEBORAH MCGINNIS,

        *Defendant-Appellee.*

No. 06-5782

>

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 05-20128—Jon Phipps McCalla, District Judge.

Argued: April 25, 2007

Decided and Filed: September 7, 2007

Before: SUHRHEINRICH, CLAY, and SUTTON, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Frederick H. Godwin, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. Bruce I. Griffey, Celebration, Florida, for Appellee. **ON BRIEF:** Frederick H. Godwin, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. Bruce I. Griffey, Celebration, Florida, for Appellee.

    SUTTON, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. CLAY, J. (pp. 9-14), delivered a separate dissenting opinion.

---

**OPINION**

---

    SUTTON, Circuit Judge. At issue in this case is the legality under the Fourth Amendment of the detention and search of a woman (and her luggage) by customs officials after she had entered the country. Because the officials obtained information soon after she passed through customs that gave them an objectively reasonable basis for suspecting that she had smuggled more than $10,000 in cash into the country without declaring it—the arrest of her traveling companion on similar charges, an incriminating statement and suspicious behavior—we uphold the search and reverse the district court's contrary decision.

1

I.

At 3:15 p.m. on April 2, 2005, Northwest Airlines flight 57 from Amsterdam arrived at Memphis International Airport. Like all passengers arriving in Memphis, Deborah McGinnis and her traveling companion, Michael Ely, passed through the primary customs-inspection station where customs agents stamped their passports and reviewed their declaration forms. At that point, customs officers directed McGinnis and Ely to the secondary inspection area.

At approximately 3:40 p.m., customs officer Brian Hooper conducted the secondary inspection of McGinnis. She handed him her customs-declaration form, on which she had marked "no" in answering whether she was carrying currency or monetary instruments totaling $10,000 or the foreign equivalent of that amount. She showed Hooper a U.S. Department of Defense contractor card as proof of identity and told him that she had been in Kuwait and Iraq. He informed her of the $10,000 currency limit, telling her "it wasn't illegal to carry as much money as you wanted, but if it was more than $10,000, you had to declare it and fill out a form." JA 118. McGinnis again denied that she was carrying more than $10,000, stating that "she was carrying 3000 U.S. dollars." *Id*.

After Hooper asked to see the cash she had brought into the country, McGinnis produced a "small stack of money" from her purse, which Hooper thought was consistent with $3,000. JA 119. He searched McGinnis's checked luggage, found nothing and released her at 4:05 p.m.

Although McGinnis was free to leave the federal inspection station, she waited for Ely, whom customs agents were still detaining some 15–20 feet away. McGinnis remained in the inspection area for "[a]t least 30 minutes," then "left on her own." JA 126.

Meantime, while Ely had declared on his customs form that "he was carrying between $6[000] and $7000," an initial inspection of his luggage turned up more than $13,000. JA 194. Customs official Raymond Polley recalled seeing McGinnis still standing in the federal inspection area after officers made this discovery. Customs official Blaine Crum spoke briefly with Ely, who told him that "he had grabbed a quantity of money out of the safe and he didn't know how much money he had grabbed." *Id*. Crum instructed officers to conduct another search of Ely's luggage.

The second search uncovered an additional $11,000 hidden in Ely's bags. After being handcuffed, Ely admitted that he had stuffed approximately $2,500 in his back pocket. All told, Ely had attempted to smuggle $24,088 in U.S. and foreign currency into the country.

Polley gave Ely two options: He could let the airline hold onto his luggage, or he could give it to his traveling companion. Ely chose to ask McGinnis to look after his luggage. The officials paged McGinnis, and Polley told her that they had arrested Ely and that he wanted her to retrieve his luggage. Polley sent two customs officers in a van to pick up McGinnis in B Concourse (1,582 feet from the inspection station) and to bring her back to the customs area. The officers found her at the front of the airport near the Northwest Airlines ticket counter. McGinnis told one of the officers—Todd Key—that she was on a 30-day leave from Iraq, that she had been traveling for 4 days, that she planned to spend 2 days in Memphis and that she had been "getting tickets for the next leg of her trip." JA 180.

After McGinnis and the officers reentered the federal inspection station at approximately 6:00 p.m., Key explained the "currency reporting requirements" to McGinnis: "I advised [her] it's okay to carry any amount of currency in and out of the United States," but if she had "over $10,000" she "would have to fill out a CMIR [Currency or Monetary Instruments Report], and she advised that she thought she would be taxed on the money" if she reported it. JA 181. Key shared McGinnis's comments with Crum.

While McGinnis was sitting in the secondary inspection area waiting to pick up her travel companion's luggage, Polley observed that she "seemed very nervous. . . . She was fidgety, her face was somewhat flushed. She seemed to be perspiring a little bit," JA 146; Key observed that "[s]he was looking around a lot. . . . [H]er face was kind of flustered and it was a little red and she was kind of sweating," JA 182, and described her as "visibly nervous" while he was questioning her, JA 187; Crum indicated that "[s]he appeared nervous, she was sweating, she was fidgety, red faced, flushed," JA 197. Suspicious that McGinnis "might possibly have money also," *id.*, Crum, who had already learned of McGinnis's tax comment from Key, spoke with Polley, then instructed Key and another officer to get McGinnis's luggage out of the van and bring it inside for reinspection.

Just before or at roughly the same time as the reinspection of McGinnis's luggage, Polley asked McGinnis "whether things had changed in regard to her bags or whether she had acquired additional funds while she was in the airport." JA 146. McGinnis said she did not acquire or exchange money. While the officials questioned McGinnis, the money seized from Ely's luggage sat on a table in front of them.

Polley asked McGinnis again how much money she possessed. She told him she had $5,000. Polley asked if McGinnis wanted to amend her customs declaration and "she advised [him] she was carrying $12,000 to be on the safe side." JA 184. Inspectors searched her luggage and found $17,358—$16,396 in U.S. currency and $962 in Kuwaiti currency. McGinnis said she had obtained the money when she "closed out a bank account in Kuwait" before traveling to the United States. *Id*.

On April 14, 2005, a federal grand jury indicted McGinnis on charges of "bulk cash smuggling" into the United States, *see* 31 U.S.C. § 5332(a), and making a false statement to a federal officer, *see* 18 U.S.C. § 1001(a)(2). McGinnis filed a motion to suppress all evidence obtained as a result of her detention and the search of her luggage. Following a two-day suppression hearing, the district court granted the motion.

II.

McGinnis urges us to dismiss the appeal on the ground that the government failed to comply with 18 U.S.C. § 3731, which requires the U.S. Attorney to certify to the district court "that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." *Id.*; *see United States v. Smith*, 263 F.3d 571, 577 (6th Cir. 2001). The district court entered the order granting McGinnis's motion to suppress on February 24, 2006. The United States filed its notice of appeal on March 27 but did not file the required certification until July 19, several weeks after the 30-day period for doing so had expired. The government admits that it failed to file the certificate when it should have, explaining that the attorney handling the case mistakenly believed that the certification should be filed after the U.S. Solicitor General had authorized the appeal. The attorney filed the certification after he received this authorization.

The government's failure to file a timely certificate, we have said, is "an irregularity in perfecting the appeal." *Smith*, 263 F.3d at 578. In addressing this irregularity, we look to Appellate Rule 3, *see id.*, which gives us discretion to dismiss or hear the appeal, *see* Fed. R. App. P. 3(a)(2) (stating that "[a]n appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal"). Several considerations guide this exercise of discretion: (1) the reason for the tardiness, (2) whether the government "engage[d] in a conscientious pre-appeal analysis," (3) whether the government concedes that the "certification requirement should be taken seriously," (4) whether the tardiness causes "any delay or prejudice to the defendant" and (5) "whether the appeal should be heard in the interest of justice, or for any other significant reason." *Smith*, 263 F.3d at 578.

Due consideration of these factors does not require us to dismiss the appeal. The government offered a good-faith and reasonable (though in the end ill-founded) explanation for the delay—the attorney's mistaken belief that the Solicitor General's office must approve the appeal before the certification could be filed. The government obtained declarations from the First Assistant U.S. Attorney for the Western District of Kentucky and from the Chief of the Criminal Division, indicating that the government had engaged in a conscientious analysis of the case before appealing it. The government attorney handling the case has emailed all attorneys in the U.S. Attorney's office for the Western District of Tennessee to remind them of the certification requirement, showing that the government takes the certification requirement seriously. *See United States v. Bates*, 146 F. App'x 795, 798 (6th Cir. Aug. 24, 2005) (addressing merits of appeal due to the government's "good-faith efforts to comply with [Section 3731]"). And the only prejudice McGinnis has suffered is "pre-trial release and all the restrictions and burden that go along with it," Br. at 7, which by itself does not justify dismissing the appeal, *see Smith*, 263 F.3d at 580 (declining to dismiss the appeal despite defendant's claims of prejudice from "the harm of delay" and from the fact that "pre-trial release is a deprivation of liberty").

III.

The Fourth Amendment says:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Two accepted applications of the guarantee frame today's dispute. At one extreme: police officers may not seize individuals minding their own business on a public street and search their belongings without probable cause and a warrant—or at least reasonable suspicion under some circumstances. *See Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (plurality) (noting that absent probable cause and a warrant, a "person approached [by police] . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way"); *Reid v. Georgia*, 448 U.S. 438, 440 (1980) (per curiam) (noting that "[w]hile the Court has recognized that in some circumstances a person may be detained briefly, without probable cause to arrest him, any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity"); *Terry v. Ohio*, 392 U.S. 1, 9, 30 (1968).

At the other extreme: customs officials may stop and search individuals and their luggage before they board any airplane or when they enter the country by air without a warrant and without reasonable suspicion or probable cause. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Border searches "are reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616 (1977), where the sovereign has a right to "regulate the collection of duties and to prevent the introduction of contraband into this country," *Montoya de Hernandez*, 473 U.S. at 537. *See United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004); *United States v. Lawson*, 461 F.3d 697, 699 (6th Cir. 2006).

Between the extremes: while the ban on "unreasonable searches and seizures" gives law enforcement more latitude to search and seize travelers (and their luggage) as they board airplanes and as they enter the country by air, it still has force within an airport. Law enforcement may not search people and their luggage simply because they happen to be in an airport. *See, e.g., Royer*, 460 U.S. at 507–08. And even when law enforcement has a legitimate ground for searching an

individual or her suitcase, the length and manner of the detention still may violate the Fourth Amendment. *See, e.g.*, *United States v. Place*, 462 U.S. 696, 709–10 (1983).

This case lies between the extremes. What happens when the individual has crossed the border (and customs officials already have exercised—or chosen not to exercise—their right to conduct a suspicion-less search of the individual or her luggage), when the individual has not left the airport and when customs officials learn that her traveling companion has attempted to smuggle items illegally across the border? May customs officials bring the individual back to the "border" inspection station and search her as if she had never crossed the border? May they stop and search her based only on the suspicion that arises from guilt by traveling association? Or must the officials satisfy a reasonable-suspicion or probable-cause requirement, which may allow them to consider the misdeeds of a traveling companion but will not allow them to rely on those misdeeds alone?

While we have not faced this fact pattern, other circuits have and, in doing so, they have adopted something called the "extended border search doctrine." *See, e.g.*, *United States v. Yang*, 286 F.3d 940, 949 (7th Cir. 2002) (upholding search of defendant airline passenger as valid extended-border search after his travel companion was caught with drugs despite the fact that defendant himself had already passed through customs); *United States v. Cardenas*, 9 F.3d 1139, 1153 (5th Cir. 1993) (holding that second search of defendant was valid under extended-border-search doctrine even though defendant had already passed through customs and was brought back to the border checkpoint after a search of her travel companion netted suspected drug-smuggling paraphernalia); *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1422–23 (9th Cir. 1984) (determining that search of defendant airline passenger who entered the country via New Orleans, then flew to Houston and on to Los Angeles was valid extended-border search); *United States v. Garcia*, 672 F.2d 1349, 1366–67 (11th Cir. 1982) (concluding that search of an unidentified plane and its passengers was a valid extended-border search even though the plane landed twice before the search and the passengers ran into the woods and officers did not locate the passengers for more than an hour); *United States v. Bilir*, 592 F.2d 735, 741 (4th Cir. 1979) (deeming "deliberately delayed search" of a ship valid as extended-border search); *see also United States v. Caminos*, 770 F.2d 361, 364–65 (3d Cir. 1985) (discussing extended-border-search doctrine but instead upholding search as valid "functional equivalent" of the border search); *United States v. Glaziou*, 402 F.2d 8, 14 n.3 (2d Cir. 1968) (discussing extended-border-search doctrine but instead upholding the search in question as a valid border search, not as an extended-border search).

The upshot of these cases is to treat the encounters not as border searches (in the sense that no suspicion is required) and not as run-of-the-mine searches (in the sense that a warrant and probable cause are required) but as searches that require something in between—reasonable suspicion. *See, e.g.*, *Yang*, 286 F.3d at 945. While this standard imposes a limit on customs officials after the individual has crossed the border, it relaxes the normal requirements of a warrant premised on probable cause in recognition of the "many difficulties that attend" customs officials' "attempt[s] to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers," *Bilir*, 592 F.2d at 740, and enables them to delay apprehending suspected smugglers "in circumstances where surveillance may lead them to 'higher ups' or other cohorts in the illegal enterprise," *United States v. Niver*, 689 F.2d 520, 526 (5th Cir. 1982) (internal quotation marks omitted).

In deciding whether to uphold an extended-border search as reasonable, courts generally have asked three questions: (1) did the individual cross the border? (2) did law enforcement seize the individual and her luggage sufficiently soon after the crossing to be reasonably confident that the condition of the individual and her luggage did not change after the border crossing? and (3) does law enforcement have a reasonable suspicion that the individual violated a criminal law? *See, e.g.*, *Yang*, 286 F.3d at 945; *see also United States v. Espinoza-Seanez*, 862 F.2d 526, 531 (5th Cir. 1988) (applying similar test); *Alexander v. United States*, 362 F.2d 379, 382 (9th Cir. 1966). The salient question is whether "reasonable suspicion" of criminal activity exists, paying special

attention to whether the suspected criminal activity relates to a recent border crossing (*e.g.*, smuggling as opposed to a murder charge) and whether the search occurred sufficiently close in time to the border crossing as to eliminate the risk that the individual obtained the contraband after the crossing. Except for the dice-loading name of the rule—an "extended border search" doctrine suggests that suspicion is never required in the same way that an "extended house search" doctrine would suggest that probable cause is always required—we adopt our sister circuits' general approach to this issue.

The search of McGinnis satisfies these requirements. *First*, no one questions that McGinnis crossed the border. She had just traveled by plane from Amsterdam and crossed the "border" at the Memphis International Airport.

*Second*, the customs officials had a reasonable basis for concluding that the condition of McGinnis's luggage had not changed by the time of the search. The illegal contraband was the $17,358 in cash that McGinnis hid in her luggage and refused to declare when asked to do so. McGinnis never left the airport terminal. While waiting for Ely, she went to "get[] tickets for the next leg of her trip," JA 180, which at most would have permitted her to *spend* money, not to get more of it. It suspends reality to think that McGinnis could have acquired the necessary additional cash—over $7,000—to trigger the currency reporting requirement between the time she exited the inspection area and the time officers came to pick her up to take her back to customs—at most 1 hour and 35 minutes. *See* JA 125–26, 129–30, 144, 201. Obtaining more than $7,000 in an airport in general or at an ATM in particular in such a short time span strikes us as a daunting, if not a nearly impossible, task. *See generally Yang*, 286 F.3d at 948 (valid search even though defendant was not under surveillance in the airport for up to 45 minutes); *United States v. Mejias*, 452 F.2d 1190, 1192–93 (9th Cir. 1971) (valid search even though 90 minutes had elapsed since defendant, who was not under constant surveillance, passed through customs at airport); *cf. United States v. Ramos*, 645 F.2d 318, 320–21 (5th Cir. 1981) (valid search even though 30 minutes elapsed after defendant cleared airport customs and defendant had checked into an airport hotel); *United States v. Walters*, 591 F.2d 1195, 1198 (5th Cir. 1979) (valid search even though 55 minutes elapsed after defendant cleared airport customs and defendant was not under surveillance during that time).

*Third*, customs officials had reasonable suspicion that McGinnis had engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20–23 (1968); *Yang*, 286 F.3d at 949 (noting that the "final factor in the extended border search doctrine is analogous to a *Terry* stop") (internal quotation marks omitted). We agree with the district court, as an initial matter, that guilt by association does not by itself suffice to establish the reasonable suspicion necessary to seize and search an individual who already has passed through customs. D. Ct. Op. at 24–25. But there was more to the customs officials' suspicion than that: McGinnis and her traveling companion were returning to the United States from Kuwait and Iraq, where McGinnis was a Department of Defense contractor and where officials could reasonably infer (as they did) that she earned an ample salary; and as McGinnis sat in the customs area after returning to pick up Ely's luggage, multiple officers noticed she "seemed very nervous," JA 146, was "perspiring a little bit," *id.*, and "was fidgety, red faced, flushed," JA 197. More suspicious than all of this, however, was McGinnis's remark after Key "advised [her] it's okay to carry any amount of currency in and out of the United States" as long as it is reported. JA 181. In response, she said "that she thought she would be taxed on the money" if she reported it. *Id.* We can conceive of no other way to interpret McGinnis's words—and McGinnis has given us none on appeal—than that she had hidden some amount of money from customs officials to avoid paying taxes on it. This incriminating comment, together with the other circumstances, gave customs officials ample grounds for reasonably suspecting that criminal activity was afoot.

McGinnis argues that she could have obtained additional funds during the time she was "unobserved" following her exit from the customs-inspection area. Br. at 39. To the extent she

means to argue that the lack of continuous surveillance prohibits us from upholding the search as proper, no case to our knowledge supports her conclusion. *See Cardenas*, 9 F.3d at 1150 (stating that "continuous surveillance is not a requirement of an extended border search"); *see also Yang*, 286 F.3d at 948 (noting that "extent of surveillance" is one of the "[c]ircumstances that courts consider" but upholding search despite 30–45 minute break in surveillance); *Caicedo-Guarnizo*, 723 F.2d at 1422 (listing "the continuity of surveillance over the suspected smuggler" as one "of the circumstances that the fact finder should consider" but upholding search despite some "interruptions in the surveillance" of the defendant); *Mejias*, 452 F.2d at 1192–93 (upholding search despite 90-minute gap in surveillance and noting prior cases "sustain[ing] the validity of border searches conducted away from the actual border in spite of substantial lapses in surveillance").

Nor can McGinnis tenably argue that the search was invalid on the ground that customs officials decided to reinspect her luggage before she expressed concern about having to pay taxes on unreported money and before she exhibited nervous behavior. Although Polley testified that "the decision to re-examine [McGinnis's] luggage was probably decided upon prior to her return" to the customs-inspection area, JA 172, Blaine did not order officers to obtain McGinnis's luggage from the van and begin searching it until after he learned about her tax comment from Key and after he noticed her nervousness, as shown through this exchange during the suppression hearing:

"Q: . . . At the time that you directed the officers to bring her luggage back in, did you know that she had crossed the border?

A: Yes, sir, I did.

Q: Did you know that Mr. Ely had for certain 13,000 and you were finding more money all the time in his luggage?

A: Yes, sir.

Q: And at that time, before you ordered her luggage to come back in, did you—had you observed her physical condition?

A: Yes, sir, I did.

Q: And had you already talked to Officer Key about the statements she made about I thought I would be taxed if I declared it?

A: Yes, sir.

JA 207; *see also* JA 198 (Blaine testifying that McGinnis's luggage "was still in the van" when "Officer Key advised [him] about the statement Ms. McGinnis made about she was worried about her money being taxed"); JA 197–98 (Blaine testifying that he "had a brief conversation with Ms. McGinnis" when she returned to the inspection area, that she "appeared nervous, she was sweating, . . . fidgety, red faced, flushed" and that while he was speaking with her, her luggage "was still in the van"). Thus, by the time he ordered the search, Blaine knew all of the facts that we already have deemed sufficient to spark reasonable suspicion that McGinnis was smuggling currency into the country. More to the point, we do not judge the validity of Fourth Amendment searches based on the state of mind of the arresting officers. *See Whren v. United States*, 517 U.S. 806, 814 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."); *see also Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (reiterating *Whren*'s holding that "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis") (internal quotation marks and brackets omitted); *Bond v. United States*, 529 U.S. 334, 338 n.2 (2000) (noting that "[t]he parties properly agree that the

subjective intent of the law enforcement officer is irrelevant in determining whether that officer's actions violate the Fourth Amendment").

In reaching a contrary conclusion, the district court focused on the difference between cash smuggling and drug smuggling. It placed substantial weight on the fact that "the substance being carried by [McGinnis and] her companion was not an illegal controlled substance" and "she was not flying from a source country for illegal substances." D. Ct. Op. at 24. But customs officials have no less right to be vigilant in investigating the one crime over the other.

IV.

For these reasons, we reverse and remand the case for further proceedings.

—————————

**DISSENT**

—————————

CLAY, Circuit Judge, dissenting.  The majority misapplies the extended border search doctrine such that it deprives citizens of the right to be free from unreasonable searches and seizures under the Fourth Amendment in proximity to border crossings.  While I agree with the majority's conclusion in Part II that we have jurisdiction over this appeal, I dissent from Part III of the majority opinion.

I.

On the day of the search in question, Customs and Border Patrol Officers ("customs officials" or "officers") had been alerted by an Internal Revenue Service ("IRS") agent that Defendant and her companion, Michael Ely, would be arriving by plane from Amsterdam, Netherlands and that the IRS was interested in the laptop computers that they would be carrying. While it is unclear from the record precisely what the IRS suspected with regard to Defendant's and Ely's laptops, it is clear that the tip was in no way related to a suspicion of currency smuggling. Based on this tip, the customs officials redirected Defendant and Ely to the secondary inspection station after their initial screening.  Defendant filled out her customs declaration form and declared that she was in possession of $3,000.  Defendant underwent a twenty-five-minute-long secondary inspection of her person and her luggage.  After completing this lengthy search, the officers had discovered nothing unlawful in Defendant's possession.  Defendant remained at the security checkpoint for an additional thirty minutes waiting for Ely's search to be completed.  During the time she was still in the officers' presence, the officers declined to subject her to a supplemental routine border search, indicating that she was no longer a subject of suspicion.  As the officers continued to search Ely, Defendant indicated that she needed to purchase her ticket for the next leg of her trip.  Defendant subsequently left the security checkpoint station, after which time she was completely out of view of all of the customs officials.  The officers chose not to place her under any surveillance within the airport after she left the security checkpoint.  The officers' inspection of Ely continued in Defendant's absence for another hour.

As the officers continued inspecting Ely's luggage, it was discovered that he was in possession of over $13,000, which exceeded the amount Ely had declared on his customs declaration form.  After being told he would be arrested, Ely advised the officers that he wished to release his luggage to Defendant.  Officer Polley, the supervising officer, had Defendant paged and informed her on the airport telephone that Ely was being arrested and that she should return to pick up his luggage.  Thus, approximately ninety minutes after the completion of the search of Defendant, Polley dispatched Officer Key to find and retrieve Defendant.  Key found her and brought her back to the security checkpoint in the airport van.  Key advised Defendant that she could not leave her luggage unattended and that she would need to bring it back with her. Defendant's luggage was placed in Officer Key's van, and Defendant was taken back to the security checkpoint where Ely's luggage was being searched.  At some point prior to her return, Polley, who was responsible for ordering the reinspection of Defendant's luggage, made the decision to reinspect Defendant's luggage. He based this decision on the fact that Defendant and Ely were traveling companions, the previous tip he had received prior to her initial inspection, and the fact that she, as a Department of Defense contractor, was "rather well-paid." (J.A. at 160).  Thus, Defendant's luggage was not returned to her once she was back at the security checkpoint; instead, it remained in the custody of the officers.

As Defendant watched as the officers continue to search her friend Ely, the officers noticed that she appeared "nervous" and "flustered."  Officer Crum, after speaking with Polley and being

told that Polley wanted her luggage reinspected, instructed Officer Key and Officer Waters to retrieve Defendant's luggage from the van and begin the reinspection. Once the luggage had been taken out of the van, Key asked Defendant if everything in the bags was hers and she responded that it was. At this point, Key began to search Defendant's bags. Once he had begun the search, Key asked her if she wanted to amend her declaration about how much currency she was carrying; and she responded that she did, amending her declaration of $3,000 to $12,000. (J.A. at 183-84). After the search was completed, Key had uncovered additional currency in excess of what she had declared. The final search of Defendant's luggage, conducted over ninety minutes after she had crossed the border and following the time during which she had been under no surveillance while in the general airport for at least an hour, yielded the discovery of a total of $17,358.

II.

Generally speaking, "border searches," which occur as individuals enter and leave the United States, do not require a warrant. *United States v. Montoya De Hernandez*, 473 U.S. 531 (1985). Routine searches that take place at the border have long been recognized as reasonable. *United States v. Ramsey*, 431 U.S. 606, 619 (1977). Routine border searches may take place, however, at what would be considered the functional equivalent of a border. The Supreme Court introduced the concept of a border's functional equivalent in *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973). The Court, however, declined to elaborate upon exactly what constitutes the functional equivalent of a border, opting instead to give the following examples:

> searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*Almeida-Sanchez*, 413 U.S. at 273. The Court then went on to explain that a search on "a California road that lies at all points at least 20 miles north of the Mexican border" has not occurred at the functional equivalent of a border. *Id*. While not explicitly stated by the Court, the key attribute of the functional equivalent of a border is its proximity to the actual border. *See id*.; *United States v. Boumelhem*, 339 F.3d 414, 420 (6th Cir. 2003). In *Boumelhem*, we adopted the functional equivalent of a border doctrine. *Boumelhem*, 339 F.3d at 420. However, the extended border search doctrine contemplated today goes a step beyond *Boumelhem*. The extended border search doctrine, which several circuits have adopted, "provides that non-routine border searches that occur near the border are deemed constitutionally permissible if reasonable under the Fourth Amendment." *United States v. Yang*, 286 F.3d 940, 945 (7th Cir. 2002).

Courts have continued to classify searches as "routine" even after substantial time or significant physical space has separated the suspect from the border crossing. *See United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994) (deeming routine a secondary search that occurred only a few minutes after the defendant had crossed the border and was less than sixty feet away); *United States v. Wardlaw*, 576 F.2d 932, 935 (1st Cir. 1978) (finding that when a suspect has had his or her luggage checked, but remains at the site of the border, a second inspection is still a routine search). Thus, had the officers in the instant case taken advantage of the thirty-minute period during which Defendant remained at the security checkpoint waiting for Ely, the search would have most likely been considered routine and no addtional showing of reasonableness would be necessary. *See Boumelhem*, 339 F.3d 414, 420.

However, as a number of courts have observed, there comes a point when "a subject's relationship with the border becomes so attenuated that customs officials lose the right to detain him without a warrant." *United States v. Yang*, 286 F.3d 940, 948 (7th Cir. 2002). By determining

exactly where this point lies, the extended border search doctrine attempts to resolve a tension in Fourth Amendment jurisprudence. While it is necessary for the government to vigorously police its borders, this doctrine cannot simply become shorthand for diminished Fourth Amendment protections in circumstances where the search and seizure bears little relationship to a legitimate border search. Thus, a search is reasonable under the extended border search doctrine when: "(1) there is a reasonable certainty that a border crossing has occurred; (2) there is a reasonable certainty that no change in condition of the luggage has occurred since the border crossing; and (3) there is a reasonable suspicion that criminal activity has occurred." *Id.* at 945. As the majority correctly notes, there is no dispute that Defendant had crossed a border, so we will focus our attention on the other two prongs.

III.

### A.          Change in the Condition of the Luggage

The question of whether a reasonable certainty exists that there has been no change in the condition of a defendant's luggage has traditionally been answered by examining the totality of the circumstances. *See United States v. Alfonso*, 759 F.2d 728, 735 (9th Cir. 1985). While declining to create a rigid test to determine whether this prong is met, courts have consistently looked to three factors to make this determination. These factors are a suspect's distance from the checkpoint, the amount of time that elapsed between the border crossing and the detention, and whether the suspect was under surveillance while away from the checkpoint. *See, e.g.*, *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1423 (9th Cir. 1984); *United States v. Fogelman*, 586 F.2d 337, 339-340 (5th Cir. 1978).

The validity of an extended border search is dependent upon the officers' certainty that the suspect was in possession of any contraband when the border crossing occurred; otherwise, the doctrine simply unconstitutionally lowers the probable cause requirement for justifying the search of a citizen. *Caicedo-Guarnizo*, 723 F.2d at 1422 ("The validity of such a search depends on whether the fact finder, viewing the totality of the circumstances, is reasonably certain that the suspected smuggler did not acquire the contraband after crossing the border."). Thus, it is essential that officers be able to point to some evidence that the suspect was in possession of the contraband at the time of the border crossing. While temporal and physical proximity to the checkpoint can raise an inference that no change in the condition of luggage has occurred, surveillance of the suspect is the most direct way to insure that the suspect did not simply come into possession of the contraband after the border crossing. *See Alexander v. United States*, 362 F.2d 379, 382 (9th Cir. 1966). Accordingly, surveillance of the suspect while he or she is away from the security checkpoint has traditionally been viewed as one of the hallmarks of reasonable certainty with respect to establishing that there has been no change to the condition of the luggage. *See, e.g., Alfonso*, 759 F.2d at 735; *United States v. Espericueta-Reyes*, 631 F.2d 616, 620 (9th Cir. 1980).

This point is particularly salient in a situation like the instant case, where the contraband is not something that is illegal outside of the context of a border crossing. Unlike a case where a suspect is found in possession of an illegal narcotic or substance, which is unlawful no matter when the suspect possesses it, Defendant in the instant case was found to be in possession of currency over the amount of $10,000, an act which is unlawful only when such a sum is not declared at the border. This case raises the concern of punishing a citizen for acquiring something that may have been perfectly lawful when acquired; thus, it is of paramount importance that the border patrol agents be reasonably certain that Defendant was in possession of the additional currency when she crossed the border.

Surveillance of a suspect during his or her absence from the security checkpoint is the most effective means of providing evidence that the condition of a person's luggage has remained

unchanged after the person has passed through a security checkpoint. In fact, the Fourth Circuit has gone so far as to call surveillance "the most important single factor in assessing reasonableness" of a search under the extended border search doctrine. *United States v. Bilir*, 592 F.2d 735, 741 (4th Cir. 1979). Similarly, the Ninth Circuit has included the existence of surveillance of the suspect as an explicit element of its "*Alexander* test," which that court uses to determine whether there is reasonable certainty that there has been no change in the condition of the luggage. *See Espericueta-Reyes* (citing *Alexander*, 362 F.2d at 382-83 for the proposition that reasonable certainty should be determined by looking to the totality of the circumstances, which involves considering the amount of time elapsed, the distance from the border, and "the manner and extent of surveillance"). Other courts that have adopted the extended border search doctrine have likewise given substantial weight to the fact that the suspect was under surveillance while away from the security checkpoint in determining that the subsequent search was reasonable. *See, e.g., United States v. Garcia*, 672 F.2d 1349, 1367 (11th Cir. 1982); *United States v. Fogelman*, 586 F.2d 337, 339-340 (5th Cir. 1978).

There are rare instances in which courts have found a search reasonable under this doctrine despite the fact that there was no continuous surveillance of the suspect in his or her absence from the checkpoint. As the majority observes, in *United States v. Mejias*, 452 F.2d 1190 (9th Cir. 1971), the court upheld a search that occurred ninety minutes after a suspect passed through customs even though he was not under constant surveillance. Importantly, the suspect in that case maintained a close physical proximity to the security checkpoint area, which allowed one of the customs officials to monitor his actions after the initial search. *Id.* at 1192. Thus, the question in that case was not whether surveillance had to occur, but whether the surveillance had to be continuous. The court held that where other factors raised a strong presumption that no change in the condition of the luggage had occurred, the court could accept brief lapses in surveillance and still find with reasonable certainty that there had been no change in the condition of the luggage. *Id.* at 1193.

Likewise, the Seventh Circuit's holding in *Yang* can be distinguished on its facts. In that case, the court found in favor of the government on this factor, even though the suspect had been away from the checkpoint for between thirty and forty-five minutes and had not been under surveillance. *Yang*, 286 F.3d at 948. The court reasoned that because the suspect had entered a different terminal during that time, and thus, his luggage was uncovered while it was in the possession of airport personnel, it was highly unlikely that there had been any change in its condition since the border crossing. *Id. See also United States v. Walters*, 591 F.2d 1195, 1198 (5th Cir.1979) (finding a search reasonable despite a lack of surveillance where fifty-five minutes elapsed since the border crossing, but the defendant "was not significantly removed physically or temporally from the border."). Importantly, each of these cases acknowledged the fact that a common requirement was disregarded by not requiring surveillance of the defendant and explained the court's rationale for doing so. Where a court finds a search to be reasonable in spite of the fact that the suspect was not under surveillance for a period of time, there must be facts akin to those in *Yang* and *Walters* that justify disregarding "the most important single factor in assessing reasonableness." *Bilir*, 592 F.2d at 741.

The instant case is simply devoid of such facts. Not only was Defendant never under surveillance, but there are no facts whatsoever that can make up for this lack of surveillance. The majority opinion bases its conclusion that there had been no change in the condition of Defendant's luggage during the intervening time between the two searches entirely on two facts that fall woefully short of providing a justification for the search. First, the majority reasons that the amount of money found in Defendant's possession beyond her original $3,000 declaration, "over $7,000" (the amount was actually $14,358), was not an amount that likely could be obtained from an airport ATM. Second, the majority claims that the only activity in which Defendant could have engaged in the interval between the two searches was to purchase another airline ticket, which means she would have spent money instead of obtaining more. The majority's insistence that Defendant could not

have obtained the money from an ATM ignores the fact that Defendant could have simply acquired the additional funds from another person once she entered the airport, which would not have involved the use of an ATM at all. While it is unnecessary for us to speculate as to the source of the money, the "suspension of reality" of which the majority speaks is far from necessary in order to suppose that Defendant may have obtained the money after she crossed the border and departed from the border checkpoint.

More to the point, none of the facts upon which the majority relies were known at the time that the officers searched Defendant's luggage. It hardly needs stating that a search cannot be retroactively justified by facts uncovered during the course of that search. Such an elementary maxim is well established. *United States v. Jacobsen*, 466 U.S. 109, 115 (1984); *Whiteley v. Warden*, 401 U.S. 560, 567, n. 11 (1971); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *Rios v. United States*, 364 U.S. 253, 261-262 (1960); *Henry v. United States*, 361 U.S. 98, 103 (1959); *Miller v. United States*, 357 U.S. 301, 312 (1958); *United States v. Di Re*, 332 U.S. 581, 595 (1948); *Byars v. United States*, 273 U.S. 28, 29 (1927). The majority's *ex post facto* approach of justifying a search based on facts or evidence not known at the time that the search was conducted is wholly at odds with the requirement that reasonable suspicion or probable cause exist prior to a search being undertaken. The majority's holding runs directly contrary to the requirements of the Fourth Amendment, the extended border search doctrine this Court purports to adopt today, and even fundamental principles of logic. In the absence of observable facts or verifiable information prior to the search, the majority is entirely without support for its finding that there was a reasonable certainty that there had been no change in the condition of Defendant's luggage at the time it was searched.

### B. Reasonable Suspicion

The majority's analysis of the final prong of the extended border search doctrine is likewise deficient. Polley, the officer responsible for ordering the reinspection of Defendant's luggage, admitted that he made his decision to reinspect Defendant's luggage before she had arrived back at the security checkpoint. Polley further admitted that the facts he relied upon in deciding to reinspect Defendant's luggage were 1) that Defendant and Ely were traveling companions; 2) the previous tip he had received prior to her initial inspection; and 3) that Defendant had a relatively high-paying job. The first stated reason is alone insufficient to justify a search of Defendant. It is well-established that "guilt by association" may not be used to justify a search of an individual. *Ybarra v. Ill.*, 444 U.S. 85, 91 (1979). An equally unsupportable ground to justify the search is the fact that Defendant had a relatively high-paying job.

The previous tip the officers received about Defendant and Ely likewise provides no support for a finding of reasonable suspicion. Polley received this tip before Defendant deplaned, and based on that tip, Defendant was flagged and subjected to heightened screening precautions. No evidence was uncovered during the initial search of Defendant or the more extensive secondary search to confirm the details of this tip. Further, Defendant was released after her inspection, was not reinspected while she remained in the area of the security checkpoint, and was not placed under any surveillance when she finally left the area. Clearly, Polley was satisfied at that point that whatever suspicion had arisen from the tip was unfounded. Continuing suspicion of wrongdoing after an uncorroborated tip has been fully investigated and discounted cannot be called reasonable. *Daugherty v. Campbell*, 33 F.3d 554, 557 (6th Cir. 1994). Thus, Polley's admitted justification for ordering the search of Defendant's luggage falls far short of reasonable suspicion.

The justifications offered by the other officers who, upon Polley's orders, initiated the search are no better. Importantly, the search had already begun before Defendant amended her declaration and before she was questioned about whether she had obtained any additional money while she was away from the security checkpoint. Thus, these facts cannot be used to support a *post hoc*

rationalization for a search already in progress. *See Northrop v. Trippett*, 265 F.3d 372, 382 (6th Cir. 2001). Accordingly, the only facts which could have given rise to reasonable suspicion were Defendant's nervous behavior and her comment to Key about paying tax on money declared on her customs declaration form.

Behavior must be viewed in context in order to determine whether, in a specific situation, it gives rise to reasonable suspicion of criminal behavior. *Ornelas v. United States,* 517 U.S. 690, 697 (1996). In the instant case, the majority erroneously focuses on Defendant's "nervous" and "fidgety" behavior without placing that behavior in context. Defendant had just been told that her acquaintance was being arrested and that she had to come back and retrieve his luggage. When she arrived at the security checkpoint, she observed him being searched by officers and the money uncovered during the search "in plain sight" on the table. (J.A. at 182). Further, at this point, her own luggage was out of her possession, and it was not clear whether Defendant was free to leave. Viewed in context, Defendant's nervousness does not seem suspicious inasmuch as she was watching a friend get arrested, and it was unclear whether she was in custody as well.

This case poses an interesting problem because Polley admitted that the decision to reinspect Defendant's bags was made sometime "between the time [he] had spoken to her and asked her to return to [the security checkpoint] and her arriving back at [the security checkpoint]." (J.A. at 161). Thus, Defendant was ostensibly at the checkpoint only to pick up Ely's bags, but she had agreed for her bags to be transported back to the checkpoint, and they were not going to be returned to her without being searched. In light of the situation with which she was confronted, Defendant's nervous appearance should not have been viewed as establishing reasonable suspicion of criminal activity. Finally, Defendant's passing comment that she thought that declaring money when she crossed the border would require her to pay tax is not sufficient by itself to give rise to reasonable suspicion in order to justify the reinspection. In fact, none of the facts emphasized by the majority actually support a finding of reasonable suspicion, and, accordingly, the government cannot succeed on this prong.

The majority erroneously relies upon *Whren v. United States*, 517 U.S. 806, 814 (1996) and its progeny to support the proposition that "the actual motivations of the individual officers" are not relevant to the analysis before this Court. *Id.* However, such an argument is misplaced. While a search may be justified based on observable behavior giving rise to reasonable suspicion, the behavior observed in this case cannot support a finding of reasonable suspicion; accordingly, the district court did not commit clear error in finding that the officers lacked reasonable suspicion to justify reinspecting Defendant's luggage. This search was wholly unreasonable under the extended border search doctrine inasmuch as both the second and third prongs weigh strongly in favor of Defendant. Therefore, I respectfully dissent from the majority opinion and would affirm the district court's grant of Defendant's motion to dismiss.